**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RANDALL AMADO, *Petitioner-Appellant*, <br><br> v. <br><br> TERRI GONZALEZ, Warden, California Men's Colony, *Respondent-Appellee*. | No. 11-56420 <br><br> D.C. No. 2:03-cv-00078-PA-E <br><br><br> ORDER AND OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
January 8, 2013—Pasadena, California

Filed July 11, 2014

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Alvin K. Hellerstein, Senior District
Judge.[*]

Order;
Opinion by Judge Hellerstein;
Dissent by Judge Rawlinson

---

[*] The Honorable Alvin K. Hellerstein, Senior District Judge for the U.S. District Court for the Southern District of New York, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel withdrew an Opinion and Dissent filed October 30, 2013, filed a superseding Opinion and Dissent, denied a petition for rehearing, and denied a petition for rehearing en banc on behalf of the court, in an appeal from the denial of a 28 U.S.C. § 2254 habeas corpus petition in which the petitioner, convicted of murder, argued that the prosecution violated his rights under *Brady v. Maryland* by failing to disclose material information that would have enabled defense counsel to impeach the credibility of a critical witness.

The panel gave AEDPA deference to rulings of the California Court of Appeal, as required by *Harrington v. Richter* and *Johnson v. Williams*, but did not give deference to the Superior Court's finding of immateriality.

The California Court of Appeal held under California Penal Code § 1181(8) that petitioner had not established (1) "the newly-discovered nature of the evidence," and (2) his counsel's "inability to discover and produce the evidence at trial, with the exercise of due diligence." The panel held that the Court of Appeal's decision that the petitioner had not established that the evidence was newly discovered was an unreasonable determination of the facts. The panel held that the Court of Appeal's requirement of due diligence was

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Because the Court of Appeal's decision did not survive AEDPA review, the panel reviewed the constitutionality of the petitioner's conviction and, specifically, his *Brady* claim. Reviewing *de novo*, the panel held that the prosecution had a *Brady* obligation to produce the witness' conviction and probation records and that the evidence was material, rendering the government's failure to disclose it prejudicial.

The panel remanded with instructions to grant the writ and to release the petitioner unless the district attorney, within 60 days, initiates proceedings for a new trial.

Judge Rawlinson dissented. She focused her analysis on whether the state court's denial of relief was objectively unreasonable, not whether the petitioner suffered prejudice in the first instance, and was unable to say that no fairminded jurist could disagree that the state court's decision applying *Brady* was unreasonable. She criticized the majority's conducting a *de novo* analysis of, rather than deferring to the state court's interpretation of, a state statute.

## COUNSEL

John Lanahan (argued), San Diego, California, for Petitioner-Appellant.

Kamala D. Harris, Dane R. Gillette, Lance E. Winters, Kenneth C. Byrne, and David A. Wildman (argued), Office of the Attorney General of California, Los Angeles, California, for Respondent-Appellee.

## ORDER

The Opinion and Dissent filed October 30, 2013, and appearing at 734 F.3d 936 (9th Cir. 2013), are hereby withdrawn. They may not be cited as precedent by or to this court or any district court of the Ninth Circuit. A superseding Opinion and Dissent are being filed concurrently with this order.

With the amended disposition, Judge W. Fletcher voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. Judge Rawlinson voted to grant the petition for rehearing and to grant the suggestion for rehearing en banc. And Judge Hellerstein voted to deny the petition for rehearing and recommended rejection of the suggestion for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35.

Accordingly, the petition for rehearing and rehearing en banc is hereby **DENIED**. The court will entertain further petitions for rehearing and rehearing en banc with respect to the superseding Opinion.

**OPINION**

HELLERSTEIN, Senior District Judge:

Violence between street gangs is a scourge to communities. The prosecutors who prosecute crimes committed by these gangs perform a vital service. But prosecutors must be vigilant that excessive zeal does not violate a defendant's constitutional right to a fair trial. When that occurs, the courts must balance the needs of the community with a defendant's constitutional right to a fair trial.

Randall Amado was convicted in 1998 by a Los Angeles jury of aiding and abetting a senseless murder in a public bus. The prosecutor neglected, however, to discharge his obligation to disclose material information that would have enabled defense counsel to impeach the credibility of a critical witness against Amado. We hold in this opinion that the prosecution's failure, in violation of clearly established federal law as determined by the U.S. Supreme Court, requires that Amado be given a new trial.

## I. The Facts of Record and the Prior Proceedings

### A. The Shooting

In 1996 and 1997, the Bounty Hunter Bloods and 118 East Coast Crips were rival street gangs in southern Los Angeles. Some members of the Bounty Hunter Bloods gang attended Centennial High School, and traveled to and from school on public bus No. 53 through neighborhoods claimed by the 118 East Coast Crips. The gang members identified themselves

by the colors of their clothing: red for the Bloods, and blue for the Crips. As bus No. 53 passed through the Crips' neighborhoods, members of the Bloods gang on board frequently taunted, flashed gang signs at, spit at, and threw objects at Crips gang members standing at the bus stops.

On January 15, 1997, two members of the 118 East Coast Crips, Robert Johnson and Wilbert Pugh, decided to retaliate. Their friend, Nicholas Briggs, overheard the two propose that a large group of Crips board bus No. 53 and attack Bloods members inside. Briggs testified that Johnson carried a gun at that meeting, but that there was no discussion of shooting anyone. Johnson and Pugh decided that the attack would occur the next day, but Briggs had a court appearance to attend and declined to join them.

The following afternoon, Johnson, Pugh, and a group of their friends met near the intersection of Imperial Highway and Avalon Boulevard. When a No. 53 bus approached, at about 3:20 pm, Pugh yelled "Y'all ready?" and the group moved toward the bus as it pulled into a bus stop. Pugh and at least one other unidentified gang member boarded the bus, and Pugh cursed the Bounty Hunter Bloods members in the back. One of the Crips, possibly Pugh, shouted "Shoot this m_____ f_____ bus up," and the Crips exited. Johnson, behind the bus, poked a gun through the rear window, aimed at a passenger dressed in red, and fired, hitting two others. Corrie Williams, a student at Centennial High School, was shot in the neck and killed. Tammy Freeman, her friend, was shot in the arm. The bus driver sped off, stopping a few blocks away when he felt it was safe.

## B.  The Arrest and Prosecution

Amado was arrested with Briggs the next night.  At the time, Amado and Briggs were drinking and smoking marijuana in a backyard near the location of the shooting, and across the street from Amado's home. Johnson and Pugh fled to Milwaukee, Wisconsin.  Johnson was arrested in Milwaukee approximately a week after the murder, and he confessed to the shooting.  Pugh was also arrested in Milwaukee, although not until a year after the bus attack occurred.

Amado was indicted in Los Angeles County Superior Court on charges of first degree murder, premeditated attempted murder, assault with a firearm, and shooting at an occupied motor vehicle.  The prosecution accused Amado of aiding and abetting the shooting by running with Crips gang members to ambush and surround the bus, and by carrying a gun to the scene.

The court and prosecution were concerned about intimidation of witnesses, and retaliation against those who testified.  This fear was driven in part by the fact that Pugh was still at large at the time the proceedings began.  Based on interviews of witnesses in camera, the Superior Court ordered that the addresses and phone numbers of witnesses be withheld from the defense, and that the prosecution make witnesses available for interviews by the defense at the courthouse.  Warren Hardy was one of those witnesses, but Amado's trial counsel, Richard Lapan, did not interview him.

Pugh, Johnson, and Amado were tried together before two juries, one for Johnson, the alleged shooter, and the second,

for Pugh and Amado, the alleged aiders and abettors. While many witnesses testified as to Pugh's and Johnson's roles in the shooting, the evidence against Amado was more limited. Two witnesses testified that Amado was part of the group that gathered at the bus stop. John Grisson, a high school classmate of Amado, testified on direct that he was at the intersection of Imperial Highway and Avalon Boulevard, and saw Amado, with others, running toward the bus. However, when pressed on cross, Grisson testified that when he had seen Amado with the group it had been a few minutes before the shooting, and that he did not see Amado run toward the bus prior to the shooting, or away from the bus after the shooting. The second of the two witnesses, Natasha Barner, Pugh's girlfriend at the time of the shooting, testified that she saw Amado, along with a crowd, "coming across the street" toward the bus stop prior to the shooting.[1]  Barner said that she did not see Amado with a gun. Barner, corroborated by another witness, testified that she knew only that Johnson and Pugh were members of the 118 East Coast Crips, and no witness testified that Amado was a member of the gang. Amado, however, did have the nickname "Bang," which some viewed as a gang moniker.

Warren Hardy, who originally identified himself to the police as Warren Collins, was the key witness against Amado. Hardy lived less than a block from the intersection of Imperial Highway and Avalon Boulevard. Hardy testified that, from

---

[1] Contrary to the dissent's suggestion, neither Grisson nor Barner testified that they saw Amado board the bus. The two stated only that Amado was among the group of six to eight teenagers at the bus stop. According to most of the witnesses, only two teenagers boarded the bus. Pugh was identified as one of the two. No witness testified that Amado was the other.

his balcony, minutes before the shooting and from a distance of approximately 35 feet, he saw a short, chubby boy with slicked-back hair and a pony-tail carrying a handgun and trailing a group of teenagers heading towards Avalon Boulevard. Hardy testified that he then heard gunfire, and, shortly after, he saw several of these same teenagers run down the street. The next night, Hardy testified, he heard several teenagers behind his building talking and laughing about the shooting. Hardy testified that he called the police, who responded, found Amado and Briggs in the area where Hardy had placed the laughing teenagers, and arrested them.

At trial, Hardy could not identify Amado, neither as the person who he said had carried a gun, nor as one of the teenagers who had gathered the next night behind his building. The best that Hardy could do was to identify Amado's hairstyle as similar to the hairstyle of the person he saw with the gun. On cross examination, Hardy testified that his vision was poor, that he could not remember key details about what he saw behind his building, and that he did not want to testify because he feared for his safety.

Because of Hardy's reluctance to testify and his lack of memory, the prosecution called LAPD Detective Michelle Esquivel to testify about statements Hardy made the day after the shooting, at the time of Amado's arrest. Esquivel, reading from the notes she had taken while interviewing Hardy, testified that Hardy had identified Amado as the person who had carried a gun to the shooting.[2] Esquivel quoted Hardy as

---

[2] California law allows prior inconsistent statements of a witness to be admitted into evidence, even if not made under oath. *See, e.g.*, *People v. Ledesma*, 140 P.3d 657, 710 (Cal. 2006) (affirming the trial court's

describing the teenager as a "light-skinned, chubby male black . . . [with] a blue short-sleeved shirt, and his hair was long, slicked back." Esquivel wrote that when the police informed Hardy that Amado and Briggs had been arrested, a fellow detective asked if they "had the correct guys," and Hardy answered, "Yes."

During closing arguments, the prosecution emphasized Hardy's statement to the police that Amado carried a gun as reliable evidence of his guilt:

> Now, what did Mr. Hardy say? Randall Amado or somebody that looks like him is the guy that he saw on January the 16th, 1997, carrying a gun. The only reason why he is going to say that, or say words to the effect of he's possibly the guy that did the shooting is because he thinks that's the guy who he saw on January the 16th, 1997, with a gun. That's the only reason why you make that statement. The only reason. Now, why is Randall Amado carrying a gun to a fistfight? Is it because he himself thought this could possibly evolve into something else other than a fistfight? And if so, did he think in his own mind that the natural and probable consequences of agreeing to get into a fight could result in a shooting, so I better have myself armed before I go over there?

decision to allow a police officer to testify as to his prior conversation with a witness after that witness testified that he could not remember the conversation).

On November 30, 1998, Amado was convicted of all charges. He was sentenced to 27 years to life in prison.

### C. Amado's Motion for a New Trial and His Appeal

Following his conviction, Amado moved for a new trial. His attorney, Richard Lapan, based his motion on the failure of the prosecution to produce a probation report on the main witness against Amado, Warren Hardy. Lapan represented that the probation report on Hardy came into Lapan's possession "after trial,"[3] and that the probation report disclosed that Hardy had pleaded guilty to committing a robbery,[4] that he was on probation for that offense, and that Hardy had been a member of the Piru Bloods, an affiliated Bloods gang. The prosecution had not disclosed those facts, or given the probation report on Hardy to Amado's counsel. Lapan then interviewed Hardy, and Hardy wrote out a declaration (the "Hardy declaration") stating that he had been convicted of robbery "out of the Long Beach court" and that he had been a member of the Piru Bloods.[5]

Amado moved for a new trial on the ground that the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963), in failing to disclose Hardy's probation report. At a hearing held January 25, 1999, Lapan presented the Hardy

---

[3] Lapan did not disclose how the probation report came into his possession, stating only that he did not obtain it "until after trial."

[4] The record is not clear as to when Hardy was convicted. Lapan represented to the Superior Court that Hardy plead guilty to robbery in 1996. In his declaration, Hardy said he was convicted of robbery in 1997.

[5] The declaration was dated January 21, but lacked a year.

declaration and represented that he had "just received [Hardy's] file on the robbery when he pled guilty in 1996 that indicated he was a Piru Blood." Lapan argued that there was a reasonable probability that the result of the trial would have been different had this "newly discovered evidence" been available to impeach Hardy, and that Amado was entitled to a new trial under *Brady*. The State countered that Lapan had failed to diligently pursue information about Hardy and therefore Amado was not entitled to a new trial, and that the new evidence would not change Hardy's credibility. The State argued, based on how "the testimony played out and the way that Mr. Hardy was found by the police and the way that he came forward, it's just not a situation where Mr. Hardy's credibility on what he testified to is going to be changed by the introduction of this new evidence."

The Superior Court held that, even though Hardy's prior conviction should have been disclosed to the jury, doing so would not have changed the result. The court concluded that other witnesses had placed Amado at the scene and that Hardy had been cross-examined vigorously as to his observations:

> Mr. Hardy is not the only person who put Mr. Amado at the scene. I don't think that any more aggressive cross-examination—and he was aggressively cross-examined on behalf of Mr. Amado by Mr. Lapan about his observations and his ability to perceive, and I think that the jury had the benefit of everything that they possibly could have short of the information of the robbery, which in a perfect world they should have had. But I don't know that it reaches the level that

> warrants a new trial.  I therefore am going to respectfully deny the motion before me for new trial.

Amado appealed to the California Court of Appeal, Second Appellate District.  In response to concerns expressed by the appellate court at oral argument, Amado moved to augment the record to document that the Hardy impeachment evidence was "newly discovered."  Defense counsel Lapan added the Hardy declaration to the record, and his own declaration (the "Lapan declaration").  The Lapan declaration stated that Lapan had received no information from the prosecution about Hardy's criminal background and gang affiliation and that "I did not learn until after trial that Warren Hardy was on felony probation as a result of a robbery conviction and that in the probation report from that offense, Hardy stated that he was a 'Piru Blood.'"  The appellate court granted Amado's motion to augment the record.

In a June 14, 2001 unpublished opinion, the California Court of Appeal affirmed the Superior Court's denial of Amado's motion for a new trial, but on different grounds. The Court of Appeal determined that the impeachment material on Hardy was material, thus disagreeing with the ruling of the Superior Court.  The Court of Appeal recited that "Hardy's declaration establishes what evidence would be available and its materiality (relevance to impeachment)." Nevertheless, the Court of Appeal affirmed.

The Court of Appeal's decision was based on California Penal Code § 1181(8).  That section provides that a party moving for a new trial based on new evidence must establish that the evidence was newly discovered and could not have

been discovered with reasonable diligence.**⁶** The Court of Appeal held that Hardy's declaration did not satisfy § 1181(8) because it "does not establish that the evidence is indeed newly discovered . . . nor does it establish that defense counsel could not have discovered the impeaching facts in the exercise of due diligence." The Court of Appeal further explained that Lapan's oral representation to the Superior Court, that the impeachment evidence against Hardy was newly discovered, did not satisfy § 1181(8) because it was not evidence, since counsel "was making argument, not testifying under oath." The Court of Appeal therefore affirmed the denial of Amado's motion for a new trial because he did not present "*any* evidence to establish that the impeaching facts about Hardy were newly discovered and could not have been discovered and produced at trial in the exercise of due diligence, let alone the best available evidence." And, since Amado failed to show that the evidence was newly discovered and could not have been discovered with due diligence, as section 1181(8) required, there was no showing that the prosecution's failure to turn over the impeachment material violated *Brady v. Maryland*.**⁷**

---

**⁶** "[T]he court may, upon his application, grant a new trial . . . [w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

**⁷** The Court of Appeal also affirmed the Johnson and Pugh convictions, holding, among other things, that there was sufficient evidence to convict.

Amado filed a petition with the California Supreme Court to review the Court of Appeal's decision, but the Supreme Court denied the petition. Amado thus "exhausted the remedies available" in the California courts. *See* 28 U.S.C. § 2254(b)(1)(A).

## D.  Amado's Habeas Petition

Amado filed a petition for a writ of habeas corpus with the U.S. District Court, Central District of California on January 6, 2003. *See* 28 U.S.C. § 2254. On May 16, 2003, the magistrate judge assigned to the case issued a Report and Recommendation ("R & R") recommending that Amado's petition be granted because the prosecution had violated Amado's constitutional rights under *Brady*. The R & R found that "the undisclosed *Brady* evidence was 'substantial and was far more damaging to [Hardy's] credibility than the impeachment evidence available to the defense at trial.'" (quoting *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002)).

The R & R lay in the district court for more than six years without action. On December 14, 2009, Amado filed an application for a ruling by the district court, but 19 more months passed before any decision. On July 20, 2011, eight-and-a-half years after Amado filed his petition, the district court issued an order denying Amado's petition, and denying as well Amado's request for a Certificate of Appealability. *See* 28 U.S.C. § 2253. Applying a deferential standard of review, the court held that it was reasonable for the California courts to find that the State had not suppressed evidence, since Amado's trial counsel had had an opportunity to speak with Hardy, but had failed to do so. The court ruled also that

Amado had not demonstrated prejudice "[i]n light of the substantial evidence against Petitioner on the prosecution's aiding and abetting theory."

Amado filed a notice of appeal on August 16, 2011. This Court granted a Certificate of Appealability on September 22, 2011 as to one issue: "whether prosecution's suppression of impeachment evidence violated appellant's right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963)." We have jurisdiction to hear Amado's appeal under 28 U.S.C. §§ 1291 and 2253.

## II.  Discussion

### A.  Standard of Review

#### 1.  The Requirements of AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") federal courts apply a deferential standard of review in habeas cases.  *See* 28 U.S.C. § 2254.  If a claim was "adjudicated on the merits in State court proceedings," a writ of habeas corpus may be granted only if the state court adjudication:

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If the claim was not "adjudicated on the merits" by the state court, the review is to be *de novo*. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

The first step in determining whether we give deference under § 2254(d) is to determine which state court decision we review. Under the Supreme Court's decision in *Ylst v. Nunnemaker*, we look "to the last reasoned decision" that finally resolves the claim at issue in order to determine whether that claim was adjudicated on the merits. 501 U.S. 797, 804 (1991). When the last reasoned decision is a state appellate court decision which "adopt[s]" or "substantially incorporate[s]" lower state court decisions, we may review those lower state court decisions as part of our review of the state appellate court's decision. *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005). But, where (as in this case) a lower state court issues a decision that the state appellate court does not agree with, we review the state appellate court's decision only and do not consider the lower state court's opinion. *See id.*; *Towery v. Ryan*, 673 F.3d 933, 944 n.3 (9th Cir. 2012).

The next consideration is whether the decision being reviewed is an adjudication on the merits. Under AEDPA, an adjudication on the merits is "a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (alteration in original) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)).

If a federal claim was presented to the state court and the state court denied all relief without specifically addressing the

federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S.Ct. 770, 784–85 (2011). In that case, we "must determine what arguments or theories . . . could have supported" the state court's rejection of the federal claim, and then give deference to those arguments or theories under AEDPA. *Id.* at 786. The presumption that a court adjudicated the claim on the merits is rebuttable, for example, if "the state standard is quite different from the federal standard" or "if a provision of the Federal Constitution or a federal precedent was simply mentioned in passing in a footnote or was buried in a string cite." *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013).

Furthermore, if the state court decision gave reasons for its denial of the federal claim, we consider these reasons, and determine if the state court's adjudication was on the merits, or procedural. *See, e.g.*, *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision").

To give deference, however, does not mean to surrender all inquiry. Under AEDPA, the federal court must ascertain if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). If factual determinations are involved, the federal court must ascertain if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* If the federal court finds that the state court adjudication

on the merits does not withstand deferential scrutiny under § 2254(d), the federal court must then "decide the habeas petition by considering de novo the constitutional issues raised." *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc). This means that where a state court has adjudicated a claim on the merits with a written decision denying relief based on one element of the claim and therefore does not reach the others, federal courts should give § 2254(d) deference to the element on which the state court ruled and review *de novo* the elements on which the state court did not rule.

### 2. Recent Supreme Court Developments Regarding Deference

In two recent decisions, *Harrington v. Richter*, 131 S.Ct. 770 (2011), and *Johnson v. Williams*, 133 S.Ct. 1088 (2013), the Supreme Court appears to have tightened the rule of deference with regard to all elements of a claim.

In *Harrington*, the defendant petitioned for habeas relief, claiming that his counsel provided him with a constitutionally inadequate defense. 131 S. Ct. at 783. The California Supreme Court dismissed the habeas claim by summary order, giving no explanation for its determination. *Id.* The federal district court denied his federal habeas petition, and a three-judge panel of this court affirmed. *Id.* This Court, *en banc*, reversed. *Id.*

The U.S. Supreme Court reversed our *en banc* decision granting habeas relief. *Id.* at 792. The Supreme Court held that when a state court's order is unaccompanied by an opinion explaining the reasons for denial of federal relief, "it

may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784–85. Accordingly, the Supreme Court said a federal habeas court "must determine what arguments or theories . . . could have supported" the state court's rejection of the federal claim, and then must give deference to those arguments or theories under 28 U.S.C. § 2254(d). *Id.* at 786.

In *Johnson*, the defendant was found guilty of a murder in which a co-conspirator in a robbery killed the victim. 133 S. Ct. at 1092. On appeal, the defendant complained that the trial judge, in excusing a juror for bias because of the juror's expressed intention not to follow the judge's instructions about felony-murder, violated both the Sixth Amendment and an analogous provision of California law. *Id.* at 1092–93. The California Court of Appeal denied the defendant's appeal on state-law grounds and, although citing a leading U.S. Supreme Court case, did not discuss the defendant's argument under the Sixth Amendment. *Id.* at 1093. The defendant then sought federal habeas review under 28 U.S.C. § 2254. *Id.* The district court, applying AEDPA's deferential standard, denied the defendant's petition, but this court reversed, holding that since the state court had failed to discuss the Sixth Amendment, AEDPA deference did not apply. 133 S. Ct. at 1093–94.

The Supreme Court reversed, *id.* at 1099, holding that where a state-court opinion addresses some but not all of a defendant's claims, federal habeas courts should presume, as *Harrington* requires, that the state court opinion adjudicated

the federal claims, as well as the state claims, on the merits. 133 S. Ct. at 1094–97.**[8]**

### 3.  The Standard of Review in This Case

In the case before us, the California Court of Appeal did not incorporate, explicitly or implicitly, any element of the decision of the Superior Court.  The Superior Court denied Amado's claim because it considered the evidence that the prosecutor failed to produce immaterial.  The Court of Appeal rejected that finding.  "Hardy's declaration," the Court of Appeal stated, "establishes what evidence would be available

---

**[8]** *But cf. Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (after finding that a state court's evaluation of the performance of counsel, in an ineffective assistance of counsel claim, was unreasonable under § 2254, reviewing the prejudice requirement for an ineffective assistance of counsel claim that the state courts had not reached *de novo*); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (same).

In *Harrington v. Richter*, the Supreme Court did not mention *Wiggins* or *Rompilla*.  Based on the dictum of *Harrington* that deference under § 2254 applies to the adjudication of a claim, rather than a component of a claim, the Eleventh Circuit questioned if *Rompilla* remains good law. *See Childers v. Floyd*, 642 F.3d 953, 969 n.18 (2011) (en banc), *cert. granted, judgment vacated*, 133 S. Ct. 1452 (2013).  In contrast, the Sixth and Seventh Circuits have concluded that *Harrington* did not change the Supreme Court's prior holdings.  *See Rayner v. Mills*, 685 F.3d 631, 639 (6th Cir. 2012) ("[Supreme Court cases] mandate AEDPA deference to both prongs when the state court decision summarily dismisses the claim without explanation; when a state court decision relies only on one prong, the cases mandate AEDPA deference to that prong and de novo consideration of the unadjudicated prong."); *Sussman v. Jenkins*, 642 F.3d 532, 534 (7th Cir. 2011) ("We certainly cannot assume that the Court overruled *sub silentio* [in *Harrington*] its holding in *Wiggins*—a precedent so important to the daily work of the lower federal courts.").

and its materiality (relevance to impeachment)." Hardy's habeas claim failed, the Court of Appeal ruled, not because the evidence of Hardy's recent felony conviction was not material—his recent felony conviction, current probation status, and Blood-gang affiliation clearly could have made a difference—but because Amado's counsel had failed to show that the evidence was "newly discovered" and could not have been discovered with due diligence. Hence, the court explained, the prosecutor's failure did not violate *Brady v. Maryland*. As the Court of Appeal stated, "The record before us does not establish the prosecution's failure under *Brady* to reveal this information to defense counsel."

We give AEDPA deference to these rulings of the Court of Appeal, as *Harrington v. Richter* and *Johnson v. Williams* require. But we do not give deference to the Superior Court's finding of immateriality. Instead, deference, under *Harrington* and *Johnson*, is owed to the Court of Appeal's rejection of the Superior Court's finding. *See James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision); *Ylst*, 501 U.S. at 804 (1991) (we look "to the last reasoned decision" resolving a claim).[9]

---

[9] We note that neither party addressed the issue of the proper standard by which we are to review Amado's habeas claim. Nevertheless, we have the obligation to apply the correct standard, for the issue is non-waivable. *See Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("We agree with our sibling circuits that the correct standard of review under AEDPA is not waivable."); *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008) ("[A] party cannot 'waive' the proper standard of review by failing to argue for it."), *overruled on other grounds by Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (holding that AEDPA's deferential standard of review applied even

We next discuss the rule of *Brady*, and consider whether the decision of the Court of Appeal "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

## B.  The Requirements of *Brady*

Under the landmark case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), prosecutors are constitutionally obligated to disclose "evidence favorable to an accused . . . [that] is material either to guilt or to punishment." This prosecutorial duty is grounded in the Fourteenth Amendment, *id.* at 86, which instructs that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The purpose of *Brady* is to ensure that "criminal trials are fair," *Brady*, 373 U.S. at 87, and "that a miscarriage of justice does not occur," *United States v. Bagley*, 473 U.S. 667, 675 (1985).  Placing the burden on prosecutors to disclose information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  The prosecution is trusted to turn over evidence to the defense because its interest "is not that it shall win a case,

---

where the State failed to argue for its application); *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived.").  As the Tenth Circuit characterized the issue, "[i]t is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the congressional purpose." *Gardner*, 568 F.3d at 879.

but that justice shall be done." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The prosecution's duty to divulge relevant information is a "broad obligation." *Strickler*, 527 U.S. at 281. The prosecutor, although "not required to deliver his entire file to defense counsel," is required to turn over evidence that is both favorable to the defendant and material to the case. *Bagley*, 473 U.S. at 675. This duty exists regardless of whether the defense made any request of the prosecution; the prosecution is required to provide material, favorable information even "where the defendant does not make a *Brady* request." *Id.* at 680–82.

Favorable evidence is not limited to evidence that is exculpatory, i.e., evidence that tends to prove the innocence of the defendant. Favorable evidence includes that which impeaches a prosecution witness. In *Giglio v. United States*, 405 U.S. 150, 154 (1972), "the Government's case depended almost entirely" on one witness, yet the prosecution failed to inform the defense that the witness testified in exchange for a promise from the government that he would not be prosecuted. The Supreme Court held that the prosecution was required to inform the defense about its agreement with the witness because "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it," and the Court ordered a new trial. *Id.* at 154–55. The Supreme Court has since made clear that the prosecution must disclose all material impeachment evidence, not just evidence relating to cooperation agreements. *See Bagley*, 473 U.S. at 676.

The prosecution's duty to reveal favorable, material information extends to information that is not in the possession of the individual prosecutor trying the case. In *Kyles v. Whitley*, 514 U.S. 419, 441–42 (1995), police learned that a witness who implicated the defendant had provided a description of the suspect to the police that did not match the defendant. The prosecutors were apparently unaware that this exculpatory information even existed. Still, the Supreme Court held that the prosecutors had violated *Brady*, for they had "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. This requirement meant that prosecutors had to put in place "procedures and regulations . . . to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* at 438 (quoting *Giglio*, 405 U.S. at 154). Interpreting *Kyles*, our circuit has observed that "[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).

To summarize, a Brady claim of prosecutorial misconduct requires a petitioner to show that the evidence suppressed by the prosecutor satisfies three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281–82).

The prosecutor's obligation under Brady is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence. However, defense counsel cannot lay a trap for prosecutors by failing to use evidence of which defense counsel is reasonably aware for, in such a case, the jury's verdict of guilty may be said to arise from defense counsel's stratagem, not the prosecution's failure to disclose. In such a case, the prosecution's failure to disclose *Brady* or *Giglio* evidence would not "deprive the defendant of a fair trial," *Bagley*, 473 U.S. at 675.

## C.  Review of the Court of Appeal's Decision

The Court of Appeal found that Amado's *Brady* claim failed because Amado did not establish (1) "the newly-discovered nature of the evidence," and (2) his counsel's "inability to discover and produce the evidence at trial, with the exercise of due diligence." Under AEDPA, we defer to that finding unless the decision of the Court of Appeal is (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As we discuss below, nothing in the record suggests that defense counsel knew before or during trial, or otherwise reasonably had available to him, the key evidence that the prosecutor had failed to disclose, and which could have made a significant difference in impeaching the key witness against Amado.

### 1.   Was the Evidence Newly Discovered?

The Court of Appeal ruled that Amado did not establish "the newly discovered nature of the evidence." If his counsel had known of the impeachment material at or before the time of trial, the prosecutor cannot be said to have suppressed anything, and there was no *Brady* violation. *See Banks*, 540 U.S. at 691. However, the record does not support the Court of Appeal's ruling, and it was inconsistent with the proceedings in the Superior Court. There, the prosecutor did not contest Amado's argument that his attorney did not receive Hardy's probation report until after trial, too late to use in cross examination. The Superior Court accepted Amado's contention that the evidence was newly discovered, and ruled against him on other grounds. And the trial record indicates that Amado's counsel was unaware of this impeachment evidence at the time Hardy was cross examined. Although the Superior Court ruled that the cross examination of Hardy was vigorous, the cross examination focused on Hardy's vision. Had Amado's counsel been aware of the probation report, he surely would have cross examined Hardy regarding his prior convictions, his felony-probationary status, and his connection with the Piru Bloods.

The Court of Appeal explained its ruling by commenting that Lapan's representation, that he had not learned of the impeachment material until after trial, was "argument," and thus not evidence. But the Court of Appeal ignored that it had granted Amado's motion to augment the record and that Lapan's sworn declaration provided record testimony that he "did not learn until after trial that Warren Hardy was on felony probation as a result of a robbery conviction and that in the probation report from that offense, Hardy stated he was

a 'Piru Blood.'" There was no basis to conclude that Lapan had merely provided "argument," to question Lapan's veracity, or to overrule the Superior Court's acceptance of the evidence as newly discovered.

Under § 2254(d)'s unreasonable determination clause, "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). "[I]t is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000 (citations omitted). We hold that the decision of the Court of Appeal, that Amado had not established that the evidence was newly discovered, was an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2). There was nothing in the record that could support a finding that Lapan had the evidence that the prosecutor had suppressed when Lapan conducted his defense of Amado.

## 2. Is Due Diligence a Factor?

The Court of Appeal ruled that Amado's *Brady* claim failed because he did not establish "an inability to discover and produce the evidence at trial, with the exercise of due diligence." The issue is whether that ruling is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A decision is "contrary to" Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (internal quotation marks omitted).

Under *Brady*, as the United States Supreme Court's decisions clearly establish, the prosecutor has a "broad duty of disclosure." *Strickler*, 527 U.S. at 281. The prosecutor must presume in favor of disclosure, and resolve his doubts about the exculpatory nature of a document in favor of producing it. *See United States v. Agurs*, 427 U.S. 97, 108 (1976) (ruling that "the prudent prosecutor will resolve doubtful questions in favor of disclosure"). If a prosecutor has an open-file policy, defense counsel is entitled to rely on that policy and assume that the file will contain the documents that will be useful for impeachment or that tend to exculpate his client. *See Strickler*, 527 U.S. at 283 n.23 ("if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*"). *See also Banks*, 540 U.S. at 695 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). In other words, defense counsel may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce.

The Court of Appeal's requirement of due diligence would flip that obligation, and enable a prosecutor to excuse

his failure by arguing that defense counsel could have found the information himself. The proposition is contrary to federal law as clearly established by the Supreme Court, *see Early*, 537 U.S. at 8, and unsound public policy. Especially in a period of strained public budgets, a prosecutor should not be excused from producing that which the law requires him to produce, by pointing to that which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations. No *Brady* case discusses such a requirement, and none should be imposed. *See Banks*, 540 U.S. at 691 (setting forth the essential elements of a *Brady* claim).

The State argues that our own precedents support such an argument. The cases are distinguishable. They hold only that defense counsel cannot ignore that which is given to him or of which he otherwise is aware, and not that he is obliged to conduct interviews or investigations himself. For example, in *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991), the federal government had given defense counsel a transcript of an interview with a crucial government witness and the witness's rap sheet, but had not also supplied the witness's state prison records. We held that *Brady* had been satisfied, because "[t]he prosecution is under no obligation to turn over materials not under its control," and, "here, [the] defendant ha[d] enough information to be able to ascertain the supposed *Brady* material on his own." *Id.* This court has since clarified that *Aichele* stands for the proposition that the federal government's *Brady* obligation does not extend to "files that were under the exclusive control of [*state*] officials." *Benn v. Lambert*, 283 F.3d 1040, 1061 (9th Cir. 2002).

In *United States v. Dupuy*, 760 F.2d 1492, 1501-02 (9th Cir. 1985), we explained that when defense counsel was put on notice as to potential *Brady* material and given the opportunity to seek it out, then a defendant likely could not later claim that a *Brady* violation had occurred. No such explicit notice was provided here. *See also United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009) (the government had given the defendant "the essential factual data to determine whether the witness' testimony might be helpful"); *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (no suppression where the federal government gave the defense two reports on a government witness's criminal history and a printout from a National Crime Information Center computer search about that witness, but did not provide details about that witness's criminal history and cooperation with law enforcement in two states).

*Brady* is not so limited as the State argues. It is not likely that an interview of Hardy would have disclosed the facts that the State suppressed, as we discuss in the next section. We hold that the Court of Appeal's requirement of due diligence was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d).[10]

---

[10] The Court of Appeal's holding under California Penal Code § 1181(8), that Amado failed to show that the evidence was newly discovered and could not have been discovered with due diligence, raises the issue of an independent and adequate state ground for the decision, precluding federal habeas review. However, the State did not make this argument, and therefore waived the defense. *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003). Further, the defense does not apply.

First, it was not "firmly established" that California Penal Code

### D.  Review of Amado's *Brady* Claim

Since the Court of Appeal's decision does not survive AEDPA review, we now review the constitutionality of Amado's conviction and, specifically, his claim of a violation of *Brady*, under 28 U.S.C. § 2254(a).  *See Frantz*, 533 F.3d at 737.

Recall that a *Brady* prosecutorial misconduct claim must meet three essential elements:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or

---

§ 1181(8) requires a party seeking a new trial to submit an attorney's declaration describing when the evidence was discovered, in lieu of an attorney representation corroborating a witness's declaration.  *See Lee v. Kemna*, 534 U.S. 362, 376 (2002) (holding that the independent state ground must be "firmly established and regularly followed").  The statute itself does not require such a declaration, nor does the case the California Court of Appeal relied on, *People v. Martinez*, 685 P.2d 1203, 1205 (Cal. 1984) (in bank), which states only that facts supporting a new trial must "be shown by the best evidence of which the case admits."  Lapan had reason to believe that his statement to the Superior Court was sufficient without an accompanying declaration because California courts have held that "[s]tatements of a responsible officer of the court are tantamount to sworn testimony."  *People v. Wolozon*, 188 Cal. Rptr. 35, 37 n.4 (Cal. Ct. App. 1982) (citing *People v. Laudermilk*, 431 P.2d 228, 238 (Cal. 1967)).  In any event, Lapan did file a declaration, and the Court of Appeal, although allowing Amado to augment the record with the declaration, simply ignored it.

As to the requirement that Amado show that he could not have obtained the evidence with due diligence, that rule was not simply an independent state procedural rule, but is interwoven with, and changes the substance of, the *Brady* requirement.  *See Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law" (internal quotation marks omitted).).

because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks*, 540 U.S. at 691. Here, there is no dispute that the impeachment material meets the favorable-to-the-accused standard. We therefore turn to the other two elements. Under *Wiggins* we consider those issues *de novo*, since they were not addressed by the Court of Appeal. 539 U.S. at 534; *see also Frantz*, 533 F.3d at 737.

### 1. The Prosecutor's Duty to Turn Over the Impeachment Material

Under *Kyles*, the fact that the individual prosecutors who brought the case against Amado may not themselves have had the Hardy impeachment material in their possession is not a bar to Amado's *Brady* claim. At oral argument before this Court, the State conceded that the prosecution had access to Hardy's conviction and probation records, for Hardy was prosecuted by the same office that prosecuted Amado, the Los Angeles County District Attorney's Office.[11] Pursuant to *Kyles*, the prosecution had a *Brady* obligation to produce these records. 514 U.S. at 437. *Cf. Giglio*, 405 U.S. at 154 ("To the extent [a *Brady* obligation] places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.").

---

[11] Hardy stated in his declaration that he was prosecuted in Long Beach. Long Beach falls under the auspices of the Los Angeles County District Attorney's Office.

At oral argument, the State questioned whether prosecutors had access to records on Hardy's gang affiliation. However, that information was discussed in the very same probation report that discussed Hardy's prior felony conviction. Had the State obtained that report, as the State concedes it was required to do, it also would have discovered Hardy's gang affiliation.

### 2. Prejudice

We next consider whether Amado was prejudiced as a result of the State's failure to produce the *Brady* information. A defendant is prejudiced if the evidence that was not produced is material. As we noted above, the Court of Appeal concluded that the evidence was material. For the following reasons, we agree with the Court of Appeal.

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. The test for materiality "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. Evidence can be sufficient to sustain a verdict, and still *Brady* can be violated. *Id.* at 434–45. If "the favorable evidence [not produced] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Brady* has been violated. *Id.* at 435.

### 3. Prejudice – The Jurors' View of Hardy

The State withheld not one but three pieces of evidence that had the potential of undermining Hardy's testimony. First, Hardy had a robbery felony conviction. Defense counsel could have argued that this conviction rendered him an untrustworthy witness. Second, Hardy was on probation for that conviction at the time he testified. Defense counsel could have argued that Hardy was seeking favor with his probation officers by helping the police solve a well-publicized murder case. Third, Hardy was a former member of a Bloods gang, and the defense could have argued that Hardy was biased against a member or friend of the rival Crips.

Lapan's cross-examination of Hardy did not address any of these points, for Lapan, without the suppressed impeachment evidence, lacked a good-faith basis to ask the appropriate questions. Lapan's cross-examination was short, focusing on Hardy's weak vision and his arguable inability to identify people running across his field of vision. The suppressed information would have added to the force of the cross-examination and defense counsel's closing argument. There is a reasonable probability that the suppressed information would have made a difference, causing the jury to view Hardy's implication of Amado with a great deal more suspicion.

The State makes two arguments why the jurors' view of Hardy would not have changed. First, the State argues that Hardy was already impeached by the cross-examination on his weak vision. The suppressed information, however, could have been used to show that Hardy had a motive to embellish

the truth, and even to lie. This is an entirely different reason to cast doubt on Hardy's words than the one presented at trial.

The State's second argument is that Hardy's reluctance to testify and limited memory show that he was not biased against Amado. If Hardy was testifying against Amado in order to win favor with the prosecution, he would have been much more helpful and supplied detailed answers while on the stand, the State reasons. This argument, however, ignores Hardy's cooperation with the police the night after the shooting. Hardy provided substantial assistance to the police on that day, voluntarily calling the authorities and identifying Amado as the teenager he saw with the gun. The details of Hardy's initial implication of Amado were admitted into evidence through the testimony of Detective Esquivel, who helped fill in the gaps of Hardy's sometimes spotty testimony. Thus, Hardy's initial identification of Amado—possibly tainted by Hardy's motives for bending the truth—made it into the mix of evidence considered by the jury.

### 4. Prejudice – Reasonable Probability of a Different Result

Hardy's statements against Amado, in his testimony and as introduced through Detective Esquivel, were critical to Amado's conviction. Hardy was the only person to testify that Amado brought a weapon to the scene. Without such testimony, it is doubtful that the jury would have found that Amado had the requisite criminal intent to aid and abet Johnson's attack on the passengers on the bus. Indeed, without such evidence, Amado was just one member of a crowd. Mere presence in a crowd is not sufficient to render

a person an accomplice.  *See People v. Salgado*, 105 Cal.
Rptr. 2d 373, 381–82 (Cal. Ct. App. 2001).

At trial, the prosecution emphasized the critical nature of
Hardy's testimony.  The prosecutor argued during summation
that Hardy's testimony on Amado's carrying of a gun showed
he was involved in the "significant amount of planning and
talking" about the attack prior to the shooting.  The
prosecution emphasized that Hardy "specifically describes
somebody that looks like Randall Amado, and then later picks
that person out the next day."  Hardy was the one who
"hear[d] people discussing the shooting" and called the police
to set the case in motion.  The prosecution told the jury that
"the only reason" Hardy had to identify Amado was that he
truly believed that Amado was "the guy who he saw on
January the 16th, 1997, with a gun."  Would the prosecutor
have argued with such conviction if Hardy had been
impeached by his recent robbery conviction, his felony
probation status with a motive to curry favor with the
authorities, and his past membership in the Bloods, in
frequent rivalry and conflict with members of the Crips?  The
prosecutor's failure to discharge his *Brady* obligations
enabled him to bolster Hardy's credibility well beyond the
credibility Hardy would have had if all the impeaching
information had been made available to defense counsel and,
by defense counsel, to the jury.

Relying on California cases that broadly apply accomplice
liability to gang members, the State contends that even if
Hardy had not testified at all, Amado still could have been
convicted.  *See, e.g.*, *People v. Medina*, 209 P.3d 105, 112
(Cal. 2009) (gang member involved in a fistfight responsible
for shooting committed by another member of his gang);

*People v. Ayala*, 105 Cal. Rptr. 3d 575, 585 (Cal. Ct. App. 2010) (gang member participates in murder when he rides with a fellow gang member to assist him in a beating of a rival gang); *People v. Montes*, 88 Cal. Rptr. 2d 482, 486 (Cal. Ct. App. 1999) (gang member who wielded a chain in a gang fight responsible for shooting committed by a fellow gang member).   But without Hardy, the only evidence against Amado was Barner's and Grisson's testimony, which showed that, at best, Amado ran to the bus with many others who were not indicted.  On such evidence, it is questionable if a jury could have convicted Amado of intending to facilitate murder.  *See Salgado*, 105 Cal. Rptr. 2d at 381–82.

We do not need to decide more than the question before us—whether the prosecutor's violation of *Brady* was prejudicial.  The standard is not whether there is sufficient evidence for conviction, but whether there is a "reasonable probability" that the outcome would have been different, meaning that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Here, that standard is met.  The impeaching evidence was strong enough to cast a cloud of doubt over Hardy's testimony.  With that cloud of doubt, the remaining evidence against Amado was weak.  While Barner and Grisson both put Amado at the scene of the crime, neither of them testified that they saw him with a weapon or heard him make any statements, or heard others make statements, that suggested that Amado intended to participate in an assault.  There was no proof that Amado had any discussions with Johnson and Pugh, or had a strong relationship with them that would have suggested that Johnson and Pugh had shared their plan with Amado.  Hardy's testimony that Amado carried a gun was

influential to the jury in delivering a verdict against Amado, and it is reasonably probable that a jury, if made aware of the impeaching information against Hardy, would have given little, if any, credence to his testimony and would have returned a different verdict.

## III.    Conclusion

In failing to disclose material impeachment evidence to Amado before or during trial, the State violated Amado's right to due process under *Brady*. We reverse and remand with instructions to grant the writ of habeas corpus and release Amado from custody unless the district attorney of Los Angeles County, within 60 days, initiates proceedings for a new trial.

**REVERSED and REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that the state court's denial of Randall Amado's *Brady*[1] claim entitles Amado to habeas relief.   As the majority acknowledges, this case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* Majority Opinion, pp. 16–17. Under the strictures set forth in AEDPA, our review of state court rulings is severely cabined. Under AEDPA, even *de novo* review is not really *de novo*. Rather, we review the state court

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

decision for reasonableness. Only if the state court decision is objectively unreasonable is habeas relief warranted. *See Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003). Habeas relief is *not* warranted simply because we think the state court got it wrong. Rather, under AEDPA we must give deference to the state court decision, affording state courts "the benefit of the doubt . . ." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

As the United States Supreme Court emphasized in *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), "an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Brady*] standard itself." (citation and internal quotation marks omitted).

In *Richter*, we were reminded that "[a] state court's determination that a claim lacks merit precludes federal habeas relief, so long as fairminded jurists could disagree on the correctness of the state court's decision. . . ." *Id*. at 786 (citation and internal quotation marks omitted). The Supreme Court cautioned us: "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citation omitted).

The Supreme Court left no doubt that habeas relief should not be granted readily, stating in no uncertain terms: "If [the habeas] standard is difficult to meet, that is because it was meant to be. . . ." *Id*. The Supreme Court explained that AEDPA stopped just short of completely prohibiting relitigation in federal court of claims of error that were previously rejected in state court. *See id*. The Supreme Court

clarified that AEDPA only "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no farther." *Id*. Rather than providing a pathway to second guessing state court decisions, habeas corpus as amended by AEDPA "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . ." *Id*. (citation and internal quotation marks omitted).

Finally, we must keep in mind that the more general the rule being applied, the more leeway the state has to apply the rule in case-by-case applications. *See id*. *Brady* is a rule of general application, *see United States v. Bagley*, 473 U.S. 667, 682–83 (1985) (adopting the broad prejudice standard established in *Strickland v. Washington*, 466 U.S. 668 (1984) for *Brady* materiality analysis); *see also Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) ("[L]ike *Brady's* disclosure requirement, the materiality standard is a general rule, meaning a wide range of reasonable applications exist. . . .") (citation omitted). Accordingly, we must afford the state considerable leeway in applying the principles articulated in the *Brady* decision. We must also keep in the forefront of our analysis the limitations of our review. The majority's conclusion simply cannot be reconciled with these precepts.

Amado was convicted as an aider and abettor, which means that the prosecutor had no obligation to prove that Amado fired the shots that killed one victim and wounded another, or that he actually boarded the bus. *See, e.g.*, *People v. Salgado*, 88 Cal. App. 4th 5, 15 (2001) ("Aiding and abetting requires a person to promote, encourage or instigate

the crime with knowledge of its unlawful purpose.") (citations omitted). Therefore, any testimony regarding whether Amado had a gun or actually boarded the bus was not material. *See Banks v. Dretke*, 540 U.S. 668, 698 (2004) (defining materiality in terms of its potential effect on the outcome of the case).

Unlike the majority, I focus my analysis on whether the state court's denial of relief was objectively unreasonable, not whether Amado suffered prejudice in the first instance. *See Richter*, 131 S. Ct. at 785 (cautioning against directly reviewing the federal rule rather than reviewing the state court's application of that rule). Viewed through that prism, I am unable to say that no fairminded jurist could disagree that the state court's decision was unreasonable, and neither should the majority. *See id*. at 786; *see also Wiggins*, 539 U.S. at 520–21 (incorporating the "objectively unreasonable" standard). The state court applied *Brady*, a rule of general application, thereby implicating the considerable leeway contemplated by the Supreme Court to review of the resulting determination. *See Richter*, 131 S. Ct. at 786.

I agree with the presumably fairminded district court that the state court did not unreasonably apply *Brady*. On the issue of prejudice, which is the fulcrum of the majority's analysis, the record reflects that there was testimony, other than that of Warren Hardy, to support the aiding and abetting theory of conviction. Natasha Barner identified Amado as part of the group at the bus stop who boarded the bus to confront rival gang members. Witness John Grisson also identified Amado as among the "group of guys" who "ran

across the street" toward the bus stop where the shooting occurred, boarded the bus, and fled following the shooting.[2]

The record also reveals that Hardy was far from being a stellar witness for the prosecution. As the district court observed, Hardy endeavored to recant his testimony at every turn. He could not "remember the face" of the individual he previously identified as having a gun. He could not remember identifying anyone to the police. Hardy also confirmed that he did not witness the shooting and that he failed to identify Amado from a photograph that was presented to him during the trial. Given Hardy's extensive self-impeachment and the existence of other witnesses who attested to Amado's aiding and abetting of the shooting, it was not objectively unreasonable for the state court to find a lack of prejudice to Amado, *i.e.*, that the undisclosed evidence would not have affected the jury's verdict. *See Stickler v. Greene*, 527 U.S. 263, 293–94 (1999); *see also Richter*, 131 S. Ct. at 786 ("[H]abeas corpus is a guard against *extreme* malfunctions in state criminal justice systems, not a substitute for ordinary error correction through appeal. . . .") (citation and internal quotation marks omitted) (emphasis added). In view of the "deference, latitude and leeway" we are to afford the state court's application of the *Brady* rule, *id.*, it is hard to comprehend how one could conclude that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87.

---

[2] As noted previously, on an aiding and abetting theory of culpability, it makes no difference which individual members of the group actually boarded the bus. *See Salgado*, 88 Cal. App. 4th at 15.

The majority opinion disagrees extensively with the California Court of Appeal's application of California Penal Code § 1181(8). *See* Majority Opinion, pp. 13–14 and pp. 22. However, our deference to a state court decision should be at its zenith when the state court is interpreting a state statute. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (reminding that "the Supreme Court has repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus") (citations omitted). Far from deferring to the state court's interpretation of its own state's statute, or giving that interpretation any benefit of the doubt, the majority proceeds to completely ignore the state court's analysis, and conduct its own *de novo* analysis, including whether the California Court of Appeal properly applied California law. *See* Majority Opinion, pp. 27–32 & n.10; 37–38 (discussing the California Court of Appeal's reliance on California Penal Code § 1181 and interpreting various California cases to determine that Amado suffered prejudice).

Were the full feast of direct review spread before us, we would be free to gnaw away at the trial court's *Brady* ruling. *See, e.g.*, *United States v. Sedaghaty*, 728 F.3d 885, 898–903 (9th Cir. 2013) (reviewing *Brady* issue on direct appeal without deference to the trial court's ruling). However, the Supreme Court has told this Circuit specifically, emphatically, and repeatedly, to curb our appetite when it comes to habeas review. *See Richter*, 131 S. Ct. at 785–86 (chastising this Circuit for conducting a *de novo* review with no deference to the state court decision).

I respectfully decline to join a ruling that so clearly flouts Supreme Court precedent.  With respect, I dissent from the majority opinion.