Filed 3/23/21  P. v. Pugh CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B301904 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA037534) |
| v. | |
| WILBERT PUGH, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Reversed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Petitioner Wilbert Pugh appeals from the summary denial of his petition for resentencing pursuant to Penal Code[1] section 1170.95, which implemented Senate Bill No. 1437, making the natural and probable consequences doctrine unavailable to support a murder conviction. In this case, a jury convicted Pugh of murder. The record of conviction demonstrates that the trial court instructed the jury on the natural and probable consequences doctrine, and the jury could have convicted Pugh based on that doctrine. Pugh therefore establishes a prima facie case for resentencing on his murder conviction. Although the Attorney General initially disagreed, in responding to our request for supplemental briefing, the Attorney General now concedes that "denial of the petition was premature and that this matter should be remanded for further proceedings."[2] Accordingly, we reverse the trial court's order summarily denying Pugh's petition for resentencing. Upon remand, the trial court shall appoint counsel to represent Pugh

---

[1] Undesignated statutory citations are to the Penal Code.

[2] After we took judicial notice of the record in Pugh's direct appeal, we requested supplemental briefing on the impact, if any, of a jury instruction on the natural and probable consequences theory of murder and of our prior opinion on the petition before us. The Attorney General agrees that based on those documents, Pugh satisfied the first step of the two-part prima facie showing described in *People v. Verdugo* (2020) 44 Cal.App.5th 320, review granted March 18, 2020, S260493 (*Verdugo*), and that we should remand the case to the trial court to determine whether Pugh has demonstrated the second step of that prima facie showing. As set forth below, Pugh has made a prima facie showing of both *Verdugo* steps, and the trial court should therefore issue an order to show cause.

and issue an order to show cause pursuant to section 1170.95, subdivision (c).

## BACKGROUND

### 1. *Pugh's Convictions*

In 1998, a jury convicted Pugh of the first degree murder of Corie Williams. The jury further found that a principal in the offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1). The jury convicted Pugh of the willful, deliberate, and premeditated attempted murder of Tyrone Lewis and found that a principal was armed with a firearm (§ 12022, subd. (a)(1)). The jury found Pugh guilty of assault with a firearm and found that a principal was armed with a firearm (*ibid.*).

### 2. *Facts Underlying Pugh's Convictions*

In an opinion following Pugh and his codefendants' appeal from the judgment of conviction, we described the facts as follows:[3]

"The 118 East Coast Crips claim the area around Avalon Boulevard and Imperial Highway as their territory. Bounty Hunter Bloods who attend Centennial High School ride the MTA bus through that territory. There is a long-standing rivalry between Bloods and Crips gangs in general and between the 118 East Coast Crips and Bounty Hunter Bloods in particular.

---

[3] In evaluating a section 1170.95 petition, we may rely on the record of conviction including this court's prior opinions. (*Verdugo, supra*, 44 Cal.App.5th at p. 333, review granted.)

3

The 118 East Coast Crips use certain insults to intimidate Bloods. . . .

"In 1996 and 1997, there had been persistent problems between the 118 East Coast Crips and Bloods who rode the number 53 MTA bus that passed by Avalon Boulevard and Imperial Highway. Specifically, Bloods would display gang signs while passing through the Crips' territory. The 118 East Coast Crips considered this disrespectful. . . .

"[Robert] Johnson [Pugh's confederate] is a member of the 118 East Coast Crips. He is known as 'Baby Kiko.' Defendant Pugh likewise is a member of this Crips gang. He is known as 'Li'l Evil.' Defendant Pugh was the leader of the 'little ones,' or very young gang members such as defendant Johnson." (*People v. Johnson et al.* (June 14, 2001, B129670) [nonpub. opn.] (*Johnson*).)

On January 15, 1997 Pugh and Johnson "said it was disrespectful for Bloods to be coming through the neighborhood. They were annoyed at Bloods displaying gang signs and yelling out the bus windows as they passed through the neighborhood. Defendants Pugh and Johnson discussed getting on the bus the next time Bloods were aboard, going to the back, beating up Bloods, then getting off at the next stop. They picked Thursday, January 16, as a good day for the attack. . . ." (*Johnson, supra,* B129670.)

On January 16, 1997, Pugh said, " 'Y'all ready?' " and boarded the bus with Johnson and Randall Amado. (*Johnson, supra,* B129670.) Amado had a handgun. (*Ibid.*) Pugh "led the group across the street" to the bus. (*Ibid.*) Pugh boarded the bus and he and his confederates "identified themselves as 118 East

4

Coast Crips, then demeaned Bloods with epithets. At least one of them shouted, 'Shoot this . . . bus up[.]' " (*Ibid.*)

Johnson used a pistol to shoot two victims, one of whom died as a result of a gunshot wound to the neck. (*Johnson*, *supra*, B129670.) After the shooting, the "Crips ran" away and were heard "laughing about the shooting. They said they heard they had shot a girl." (*Ibid.*)

In a pretrial interview, Johnson told police that he, Pugh, and others gathered. (*Johnson*, *supra*, B129670.) " 'Everyone was talking about getting the Bloods who ride the bus.' The plan was to drag some Bloods off of the bus, after which they would 'torture them and kill them.' He [Johnson] started to get on the bus but another gang member pulled him off. Defendant Johnson walked to the rear of the bus. He pointed a .40 caliber Glock at the rear window. Everyone was yelling at him to shoot. He put the gun into the rear window next to the rear door, then fired four times. . . . He was shooting at two Bloods at the rear of the bus." (*Ibid.*)

In a pretrial written statement, Pugh stated that he "was waiting at the bus stop at Imperial Highway and Avalon Boulevard with his girlfriend, Natasha Barnes (Barnes). He intended to take Barnes to his grandmother's house . . . . Defendant Pugh identified himself as an East Coast Crip. He was dressed in blue as he waited at the bus stop. There just happened to be eight East Coast Crips at the bus stop that day. When the bus stopped, a woman got on, followed by Barnes and defendant Pugh. As he was about to pay his fare, defendant Johnson went to the back of the bus, where approximately 10 Bounty Hunter Bloods were seated. After an exchange of words, defendant Johnson got off the bus." (*Johnson*, *supra*,

B129670.)  Pugh "saw a hand holding a gun come through the back of the bus as the door closed and the bus began to pull away from the bus stop . . . . He heard approximately 12 shots." (*Ibid.*)

### 3.   *Jury Instructions*

The trial court instructed the jury on natural and probable consequences as follows:  "One who aids and abets another in the commission of a crime is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find a defendant guilty of the crime[s] of murder, assault with [a] firearm or shooting into a vehicle . . . , you must be satisfied beyond a reasonable doubt that:

"1.  The crimes of assault or assault with [a] firearm were committed;

"2.  That the defendant aided and abetted those crimes;

"3.  That a co-principal in that crime committed the crimes of murder and assault with a firearm; and

"4.  The crimes of murder and assault with [a] firearm were a natural and probable consequence of the commission of the crimes of assault or assault with a firearm.

"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crimes of murder and assault with [a] firearm [and] shooting into an occupied [motor] vehicle were a natural and probable consequence of the commission of that target crime."  (Some brackets omitted.)

6

The trial court also instructed the jury on the definition of aiding and abetting and on conspiracy.[4] The court defined malice, premeditation and deliberation. The court instructed the jury on unpremeditated murder, a killing resulting from an unlawful act dangerous to life and on second degree felony murder in pursuance of a conspiracy.[5]

### 4. *Appeal from the Judgment of Conviction*

Following his direct appeal from the judgment of conviction, this court affirmed the judgment. (*Johnson, supra,* B129670.) We rejected Pugh's argument that there was insufficient evidence to support his conviction for first degree murder. (*Johnson, supra,* B129670.) We explained: "There is evidence that defendants Pugh and Amado intended to aid,

---

[4] The instruction on conspiracy provided in part: "You must determine whether the defendants are guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged . . . [including murder] was perpetrated by co-conspirators in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy." (Some brackets omitted.)

[5] The instruction on second degree felony murder in pursuance of a conspiracy provided: "If two or more persons conspire together to commit a felony inherently dangerous to human life, namely, shooting into an occupied motor vehicle, and if the life of another person is taken by one or more of them in furtherance of the common design, and if that killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are equally guilty of murder of the second degree, whether the killing is intentional, unintentional, or accidental."

promote or encourage an armed attack on Bloods who were riding the bus. When defendants Johnson and Pugh planned the attack on January 15, 1997, Johnson was armed. Defendants Amado and Johnson were armed when they approached the bus, led by defendant Pugh. Other gang members were armed as well. Inasmuch as others were able to observe that the defendants were armed, it may be inferred that each defendant would have known the others were armed. Knowing at least some gang members were armed, anyone participating in the assault on the bus could have anticipated that firearms might be used in the attack. More tellingly, Crips who boarded the bus, including defendant Pugh, shouted, 'Shoot this . . . bus up.' This is direct encouragement of assault with a firearm, an offense that foreseeably may result in murder." (*Ibid.*)

This court held that there was "ample evidence from which it may be inferred that both defendant Pugh and defendant Amado aided, promoted and encouraged an assault on Bloods who were riding the bus, an assault they knew could turn deadly. Accordingly, their convictions are supported by substantial evidence." (*Johnson*, *supra*, B129670.)

### 5. *Petition for Resentencing*

On January 28, 2019, Pugh filed a petition for resentencing. He alleged that he was convicted of first or second degree murder and he could no longer be convicted of murder because of changes made to sections 188 and 189 effective January 1, 2019. Pugh requested counsel.

### 6. *Order Denying Petition*

The trial court did not appoint counsel for Pugh. On February 1, 2019, the trial court summarily denied the petition

8

because Pugh aided and abetted the killing and was a major participant in the crime who acted with reckless indifference to human life. The court relied on *Amado v. Gonzalez* (9th Cir. 2014) 758 F.3d 1119, a Ninth Circuit case involving the codefendant Randall Amado. That opinion described the facts of the case, based on the joint trial of Amado, Pugh, and Johnson. (*Ibid*.) *Amado* described Pugh and Amado as "alleged aiders and abettors." (*Id*. at p. 1126.) The Ninth Circuit did not describe what crime Pugh or Amado were alleged to have aided and abetted or recognize that the superior court instructed the jury on the natural and probable consequences doctrine.

7. ***Second petition for resentencing***

On June 24, 2019, Pugh filed a second petition for resentencing alleging the same as in his first. Pugh requested the trial court appoint counsel for him. On July 3, 2019, the trial court summarily denied it for the same reasons in its earlier order.

8. ***Third petition for resentencing***

On August 15, 2019, Pugh filed another petition for resentencing. He made the same allegations as in his prior petitions and attached a declaration. In his declaration, Pugh cited to portions of the reporter's transcript from his direct appeal and to pages from his opening brief on appeal.

The trial court summarily denied the petition because it was duplicative of the prior petitions. Pugh appealed from the order denying his third petition.[6]

---

[6] In the interest of justice, we grant Pugh's unopposed motion to constructively file a notice of appeal from the trial

## DISCUSSION

Prior to the enactment of Senate Bill No. 1437, a defendant who aided and abetted a crime that resulted in a victim's death could be convicted under the natural and probable consequences theory even if the defendant did not act with malice. (*People v. Offley* (2020) 48 Cal.App.5th 588, 595 (*Offley*).) "The natural and probable consequences doctrine provides that ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. . . ." [Citation.]' [Citation.] The doctrine ' "imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. . . ." [Citation.]' [Citation.]" (*People v. Duke* (2020) 55 Cal.App.5th 113, 120, review granted Jan. 13, 2021, S265309.)

The Legislature enacted Senate Bill No. 1437 "after determining that there was further 'need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 838–839.) Senate Bill No. 1437 changed the law on murder and added section 1170.95, which allows defendants convicted of murder based on the natural and probable consequences doctrine to petition for resentencing. Senate Bill No. 1437 did not alter the viability of a murder conviction based on direct aiding and

---

court's February 1, 2019 order. (*In re Benoit* (1973) 10 Cal.3d 72, 84, 86 ["constructive filing . . . embodies nothing more than a basis for judicial acceptance of an excuse for the appellant's delay in order to do justice"].)

abetting liability. "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Offley*, *supra*, 48 Cal.App.5th at pp. 595–596.)

Under section 1170.95, subdivision (c), if the petitioner makes a prima facie showing that he or she is eligible for and entitled to relief under the statute, then the trial court "shall issue an order to show cause." (§ 1170.95, subds. (b) & (c); *Verdugo*, *supra*, 44 Cal.App.5th at pp. 328–329, review granted.) A prima facie showing of eligibility requires a legal determination whether the petitioner is statutorily eligible for relief. (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 898 (*Tarkington*), review granted Aug. 12, 2020, S263219.) A prima facie case of entitlement requires the court to determine whether the petitioner would be entitled to relief if the petitioner could prove the factual allegations in the petition. (*Ibid.*) " 'A prima facie showing is one that is sufficient to support the position of the party in question.' " (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1137 (*Lewis*), review granted Mar. 18, 2020, S260598.)

We recently explained the requirements for a petitioner to establish a prima facie case for resentencing under section 1170.95. (*People v. Nguyen* (2020) 53 Cal.App.5th 1154 (*Nguyen*).) "Under section 1170.95, subdivision (a), 'A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory

11

of felony murder or murder under the natural and probable consequences doctrine.  [¶]  (2)  The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder.  [¶]  (3)  The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' " (*Nguyen*, at p. 1164.)

"In determining whether a petitioner has made a prima facie showing that he or she is entitled to relief, the 'trial court should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law—for example, a petitioner's assertion that a particular conviction is eligible for relief where the crime is not listed in subdivision (a) of section 1170.95 as eligible for resentencing. Just as in habeas corpus, if the record "contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner." [Citation.]  However, this authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, [subdivision] (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion . . . .' [Citation.]" (*Nguyen*, *supra*, 53 Cal.App.5th at pp. 1165–1166.)  We explained that a petitioner fails to establish a prima facie showing if the petition is untrue as a matter of law. (*Ibid*.)

We reached the same conclusion in *People v. Swanson* (2020) 57 Cal.App.5th 604, 612, review granted February 17, 2021, S266262, stating that the "contents of the record of

12

conviction defeat a prima facie showing when the record shows as a matter of law that the petitioner is not eligible for relief." (See also *People v. Duchine* (2021) 60 Cal.App.5th 798, 815 ["absent a record of conviction that conclusively establishes that the petitioner engaged in the requisite acts and had the requisite intent," the petitioner has established a prima facie case]; *People v. Drayton* (2020) 47 Cal.App.5th 965, 982 (*Drayton*) [reversing the trial court's order finding no prima facie case because the trial court engaged in factfinding that was not supported as a matter of law by the record of conviction]; but see *People v. Garcia* (2020) 57 Cal.App.5th 100, 116, review granted Feb. 10, 2021, S265692 ["The trial court should not accept the petitioner's assertions as true and issue an order to show cause if substantial evidence in the record supports a murder conviction under current law."].)

Turning to this case, Pugh has established a prima facie case of eligibility and a prima facie case of entitlement to relief. Pugh satisfied the first prima facie stage because his petition shows that he is statutorily eligible for relief as a matter of law. (*Tarkington*, *supra*, 49 Cal.App.5th at p. 897, review granted.) He was convicted of murder based on a charging document that allowed the prosecution to proceed under the natural and probable consequences theory. (See *ibid*.)

At the second prima facie stage, "the court must take petitioner's factual allegations as true and make a preliminary assessment regarding whether he or she would be entitled to relief if the factual allegations were proved." (*Tarkington*, *supra*, 49 Cal.App.5th at p. 898.) Here, Pugh's petition asserted facts, which if accepted as true, established a prima facie case for

relief.[7]  Specifically, Pugh alleged that he was convicted of murder based on the natural and probable consequences doctrine and could not now be convicted of murder because of changes to sections 188 and 189.  The record shows that the trial court instructed the jury on natural and probable consequences and we cannot rule out the possibility that the jury relied on the natural and probable consequences doctrine in convicting Pugh.  Because Pugh established a prima facie case for eligibility and for entitlement, the trial court was required to issue an order to show cause.  (*Drayton*, *supra*, 47 Cal.App.5th at p. 982; § 1170.95, subd. (c).)  Upon remand, the trial court should appoint counsel to represent Pugh.  (*Lewis*, *supra*, 43 Cal.App.5th at p. 1140, review granted [because petitioner made a prima facie case that he falls within the provisions of the statute, he is entitled to counsel].)

---

[7] Although the Attorney General argues that the trial court should determine whether Pugh made a showing he is entitled to relief, the Attorney General offers no legal theory under which Pugh fails to make that showing.

14

## DISPOSITION

The order denying Pugh's petition for resentencing is reversed.  Upon remand, the trial court shall appoint counsel for Pugh and shall issue an order to show cause pursuant to Penal Code section 1170.95, subdivision (c).

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

FEDERMAN, J.*

---

&ast;  Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.