Filed 3/14/25  P. v. Shupp CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

SEAN DAVID SHUPP,

    Defendant and Appellant.

</td><td>

F086440

(Super. Ct. No. SC082063A)

**OPINION**

</td></tr>
</table>

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Elizabet Rodriguez, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Meehan, J. and DeSantos, J.

## **INTRODUCTION**

In 2001, appellant and defendant Sean David Shupp (appellant), a state prison inmate, was convicted after a jury trial of the second degree murder of his cellmate, Michael Blodgett. Appellant was sentenced to 18 years plus 45 years to life. This court affirmed the judgment on direct appeal.

In 2023, the trial court recalled appellant's sentence and ordered three prior prison term enhancements stricken pursuant to Penal Code[1] section 1172.75. The court denied his motions to dismiss two prior strike convictions and two prior serious felony enhancements, and resentenced him to 15 years plus 45 years to life.

On appeal, appellant asserts the matter must be remanded because the prosecution violated its mandatory constitutional duty at the section 1172.75 hearing, pursuant to *Brady v. Maryland* (1963) 373 U.S. 83, to produce alleged exculpatory evidence arising from a civil lawsuit filed by Blodgett's family against the prison, that purportedly exonerated him or mitigated his culpability for his cellmate's death. Appellant argues that once the People comply with *Brady* and produce this evidence, the trial court must reduce his sentence or order his release on parole.

As will be explained, appellant's *Brady* claims are solely based on his self-serving statements in a letter that he wrote to the trial court, and not otherwise supported by the record. In addition, the entirety of the record shows appellant and his attorneys have known about this alleged evidence since appellant's jury trial in 2001. We deny appellant's request for remand and affirm the court's resentencing order.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

## FACTS[2]

As of April 2000, appellant and Blodgett had been housed together as cellmates in the administrative segregation unit at the California Correctional Institute Tehachapi (Tehachapi) for approximately one month. Inmates were placed in administrative segregation because of infractions or rule violations. Once an inmate was in administrative segregation, the prison had to approve of the inmate's housing assignments, yard privileges, and whether an inmate had a cellmate. The correctional officers from that unit testified appellant and Blodgett appeared to get along after they became cellmates.

At approximately 8:15 p.m. on April 21, 2000, Correctional Officer Jackson Copeland looked through the window of the cell shared by appellant and Blodgett, and saw Blodget lying on the floor, on his back with his hands to his side. There was blood around Blodgett's face, and he appeared to be coughing or spurting blood. Appellant was standing in the cell and had not called for help. Copeland asked appellant through the door what happened, and appellant shrugged his shoulders.

Copeland immediately sounded the alarm for assistance. Correctional Officer Jesus Luna ordered appellant to back away from the cell door and face the rear of the cell.

---

[2] After the parties filed their briefs in the instant appeal, we filed an order pursuant to Government Code section 68081, that informed the parties we were considering taking judicial notice of our own records and the nonpublished opinion in appellant's direct appeal, *People v. Shupp* (May 8, 2003, F039199) (*Shupp*), ordered the Clerk/Executive Officer of this court to immediately transmit these records electronically to the parties, and gave the parties 15 days to submit supplemental letter briefs as to whether they objected.

Appellant filed a letter brief and raised objections under certain circumstances. The People did not file a letter brief. As we will discuss in section III, *post*, we overrule appellant's objections and take judicial notice of our own records from appellant's direct appeal, from which the following factual and procedural statements are taken.

Appellant told Luna to "calm down" and complied with the order. The officers opened the cell door, and they restrained and removed appellant.

**Blodgett's Death**

Immediately after appellant was removed from the cell, the correctional officers entered and determined Blodgett was unconscious. Blodgett's face was swollen and purple. There was blood on his face and neck, blood was coming out of his nose and mouth, and he was choking and gasping as if he was trying to breathe.

Gary Gilman, a prison medical technical assistant, arrived at the cell shortly after appellant was removed. Blodgett was lying on the cell floor with blood bubbling in his mouth. Gilman rolled him over and cleared his airway. Gilman testified Blodgett had redness, contusions, and bruises on both sides of his face, the top of his head, and around the eyes. There were ligature marks on Blodgett's neck. Gilman saw blood on the cell's wall, and testified he did not do anything to cause blood to spatter there.

Gilman and the officers were in the cell with Blodgett for approximately three to four minutes, then placed him on a litter, lifted him out of the cell, and put the litter on a gurney. Within another minute, they pushed the gurney out of the cellblock and rushed Blodgett to the prison facility's emergency room.

As Blodgett was being treated by the prison's medical staff, his breathing and pulse stopped, and the team began performing cardiopulmonary resuscitation (CPR). Blodgett never regained consciousness or resumed breathing on his own. The medical team continued CPR for another 45 to 60 minutes until a physician pronounced Blodgett dead.

**Appellant's Statements**

After appellant was removed from the cell he shared with Blodgett, Correctional Officer Michael LaPorta escorted him to a holding cell. Appellant turned back toward his own cell and appeared to yell at Blodgett, "[S]ee, mother f[***]er, I'm not your friend.

I'm not your friend." As other inmates made comments to him, appellant smirked and said, "[T]hat's why I beat you up, you're not my friend," and began to laugh.

Appellant had a small abrasion on his left knee, a possible injury on his left arm, and the back of his right hand was swollen. Appellant's shoes were torn and bloody. Appellant's left shoe appeared to be stained with inmate-manufactured alcohol.[3] There was an apparent blood stain on appellant's boxer shorts. Appellant had the strong odor of inmate-manufactured alcohol.

A bloody sheet was on the floor of their cell, under a shelf and near the location where Blodgett was lying. The sheet was twisted with a noose-like loop at the end, in such a manner as to be used as a weapon of strangulation. There were cups in the cell that had the odor of inmate-manufactured alcohol.

**Autopsy Evidence**

Dr. Donna Brown, a forensic pathologist, performed the autopsy on Blodgett and testified the cause of death was lack of oxygen to the brain.

Blodgett's head was swollen and both eyes were bruised. There were numerous scratches on his upper arms, chest, knees, shins, and the back of his legs. Blodgett's neck was very swollen with scratch marks on both sides, and the inside of his mouth was swollen.

Blodgett's brain was extremely swollen because of multiple blunt force trauma inflicted to his head, face, and neck. There was separate damage to his larynx, his voice box was swollen, and those injuries also caused swelling to his brain. Either injury would have caused sufficient brain swelling to result in death. There were bruises and bleeding on the undersurface of his brain, also consistent with blunt force trauma.

---

[3] Approximately two or three days before the homicide, appellant asked for and received a new, clean pair of prison-issued shoes after telling an officer that he "blew out" his old pair on the handball court.

The trapezius muscles on both sides of Blodgett's neck were almost completely torn, which would have required application of an extreme amount of force. The injuries were consistent with something having been wrapped around Blodgett's neck and pulled from behind as Blodgett resisted by pushing forward. The scratch marks on his neck were consistent with a ligature device such as a twisted sheet.

The hyoid bone, located above the voice box, was fractured so deeply inward that it tore Blodgett's esophagus and interfered with the passage of air into his lungs. This injury was not caused by a ligature device, but instead consistent with Blodgett having been stomped or kicked in the neck.

Blodgett's hands were not injured. There were marks on his upper body and face which left imprints consistent with the type of prison-issued shoes worn by appellant. Blodgett had soft tissue bruises on his ribs that appeared to have been caused by someone stomping him with a foot.

Dr. Brown testified the major injuries to Blodgett's head and larynx caused his lungs to become enlarged as he fought to breathe. Dr. Brown was unable to determine how long Blodgett lived after the injuries were inflicted but testified death probably occurred within minutes. "Either the beating to the head or blunt impact trauma to the head would have been sufficient [to cause death]. With the damage to the larynx and the voice box area, with his trying to fight against the pressure, [it] would have caused … brain swelling and death. Either one would have." It was hard to tell whether Blodgett "remained conscious with either one of these mechanisms of death for … a short period of time or long period of time or died rather quickly from either one of them."

Blodgett's post mortem blood sample had a blood-alcohol level of 0.17 percent.

**Additional Evidence**

Both parties introduced evidence about appellant and Blodgett. Officer Mike Moser, an investigator with the prison's investigatory unit,[4] testified that after the murder, he learned there was animosity between appellant and Blodgett. Blodgett had a reputation for interacting with inmates of other races, and some inmates did not like that. Blodgett also had a reputation for starting fights between races without getting permission from other inmates.

The prosecution introduced evidence that in 2000, appellant told another inmate, who was being taken to the hospital, to go for the escorting officer's gun when the inmate left the prison. When an officer filed a disciplinary report about appellant regarding another incident, appellant yelled at the officer and held up a piece of paper, where he wrote that he was going to wait until after his trial to kill that officer, but changed his mind and "[y]ou're next."

The defense called inmates who testified appellant was not violent, he did not cause problems, he would not harm anyone unless his personal safety was in danger, and Blodgett had a reputation for violence. These inmate witnesses were impeached with their prior convictions.

Dr. George Solomon, a psychiatrist, testified for the defense that he reviewed the prison records of appellant and Blodgett, and the report prepared by Dr. Eugene Couture about his evaluation of appellant. There was evidence that appellant became violent with little provocation, and he had a history of mental health problems and violence. He suffered from hepatitis C and chronic prostatitis. At the time of the homicide, he had recently detoxified from heroin which would have caused increased irritability. Appellant could be provoked by insults, and he could become explosive when provoked.

---

[4] The Investigatory Services Unit (ISU) consists of correctional officers who investigate crimes that occur in prison.

Blodgett was diagnosed with a character disorder and was taking psychotropic medications. He had a history of substance abuse and alcoholism. Blodgett had engaged in multiple incidents of prior violence, he was an intimidator who provoked fights, and he should not have shared a cell with anyone.

Given their personality traits, Dr. Solomon testified there would have been problems between appellant and Blodgett within "[a] very short time. I mean it seems to me a person who blows up when getting provoked and a person who likes to provoke, even without specific reasons for an attack, which there may have been in this case, I think it's an explosive combination."

Dr. Couture, a clinical neuropsychologist, testified he evaluated appellant in March 2001. Dr. Couture testified appellant said he owed a substantial amount of money for drugs, and Blodgett also had a drug debt. Appellant said Blodgett was "forced to move on me for my debt," and he believed Blodgett was going to kill him. Appellant told Dr. Couture that he was not going to let that happen, so he intended to kill Blodgett first. Appellant said he killed Blodgett out of fear of future harm.[5]

**Appellant's Trial Testimony**

Appellant testified that on the day of the homicide, Blodgett had been drinking inmate-produced alcohol manufactured by other inmates, which he obtained by fishing a plastic bag under the cell door. Blodgett encouraged appellant to drink with him. Appellant said he did not want to drink but he eventually agreed. Blodgett was upset and appellant calmed him down. Blodgett became upset again, pushed appellant, and started yelling at him. Blodgett swung at him and appellant fought back. Appellant testified

---

[5] Dr. Couture examined appellant as a result of a court order requested by defense counsel. The court granted the prosecution's motion to call him on rebuttal after Dr. Solomon testified he relied on Dr. Couture's report, and appellant denied making certain statements to him.

Blodgett would not stop fighting, and it became a serious and "full on fight." Appellant claimed he was fighting for his life.

Appellant admitted he threw numerous punches to Blodgett's face, throat, and body, and kicked his face and the side of his ribs. Appellant denied strangling or choking Blodgett, or stomping on him after he fell down.

Appellant testified Blodgett started the fight, he had to defend himself, and Blodgett never had the advantage over him. Appellant denied that he wrapped a sheet around Blodgett's neck. Appellant testified he twisted the sheets to use for exercise. Appellant claimed the prison staff placed the blood on the sheets. He thought blood was smeared on the wall when correctional officers moved Blodgett out of the cell.

Appellant denied he intended to kill Blodgett or anyone told him to kill Blodgett. Appellant claimed the fight ended when he knocked down Blodgett, and Blodgett's head hit the back of the cell. Blodgett was alive and breathing when the officers removed appellant from their cell.

Appellant admitted he had prior convictions for assault with a deadly weapon, possession of cocaine, and felon in possession of a firearm. Appellant denied making statements attributed to him by Dr. Couture.

**PROCEDURAL BACKGROUND**

On February 14, 2001, an information was filed in the Superior Court of Kern County charging appellant with first degree murder (§ 187, subd. (a)). It was further alleged appellant had two prior strike convictions (§§ 667, subds. (c)−(j), 1170.12, subds. (a)−(e)); three prior serious felony conviction enhancements (§ 667, subd. (a)); and eight prior prison term enhancements (§ 667.5, subd. (b)).

**Trial and Instructions**

On September 10, 2001, appellant's jury trial began. He was represented by privately retained counsel.

At trial, appellant relied on theories of provocation and self-defense. The jury was instructed on first and second degree murder, voluntary manslaughter based on sudden quarrel and heat of passion, provocation, imperfect self-defense resulting in manslaughter, involuntary manslaughter, and justifiable homicide based on perfect self-defense.

The jury also received CALJIC No. 8.57, that "[w]here the original injury is a cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that the treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility. [¶] Where, however, the original injury is not a cause of the death and the death was caused by medical or surgical treatment or some other cause, then the defendant is not guilty of an unlawful homicide."

**Conviction and Sentence**

On September 19, 2001, the jury found appellant not guilty of first degree murder, and guilty of the lesser included offense of second degree murder. The trial court found all prior conviction allegations true, except for one prior prison term enhancement.

On October 17, 2001, the trial court sentenced appellant to the third strike term of 45 years to life for second degree murder, plus 15 years for three prior serious felony conviction enhancements and three years for three prior prison term enhancements. The court dismissed the remaining prior prison term enhancement. The court ordered appellant's sentence to be served consecutively to the sentences he was already serving.

**Direct Appeal**

In 2003, this court filed the nonpublished opinion in appellant's direct appeal from his murder conviction. We rejected appellant's evidentiary, instructional, and ineffective assistance contentions. We ordered correction of the abstract of judgment because it

erroneously stated appellant was convicted of first degree instead of second degree murder, and affirmed the judgment as corrected. (*Shupp*, *supra*, F039199.)[6]

In affirming the judgment, this court held: "The evidence of guilt was overwhelming. A simple comparison of the injuries suffered by [appellant] and those suffered by the victim made [appellant's] claim of self-defense incredible. There was ample evidence to support the jury's conclusion that, although [appellant's] decision to murder the victim was not premeditated and deliberate, the decision did not arise from provocation presented by the victim and [appellant] did not act in self-defense." (*Shupp*, *supra*, F039199.)

On May 14, 2004, the trial court filed the corrected abstract of judgment to state that appellant was convicted of second degree murder.

## SECTION 1172.75 PROCEEDINGS

On May 3, 2023, appellant, represented by a deputy public defender, filed a petition in the trial court for recall, resentencing, and dismissal of the prior prison term enhancements imposed as part of his aggregate third strike sentence, pursuant to section 1172.75.[7] Appellant also moved for dismissal of the two prior strike convictions, and two of the three prior serious felony enhancements, pursuant to section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and requested reduction of his

---

[6] This court's nonpublished opinion erroneously stated appellant and Blodgett were housed at Pelican Bay State Prison. (*Shupp*, *supra*, F039199.)

[7] On October 17, 2023, this court ordered the trial court to augment the appellate record to include any document demonstrating the Secretary of the Department of Corrections and Rehabilitation (CDCR) identified appellant as a person who was potentially eligible for recall and resentencing under section 1172.75. Thereafter, the trial court filed a confidential augmented clerk's transcript (CACT) with this court. On November 13, 2023, this court determined the instant matter was reviewable as taken from the denial of appellant's section 1172.75 petition for resentencing where the CDCR identified him as a person potentially eligible for relief.

11.

aggregate sentence to 25 years to life for second degree murder plus five years for a prior serious felony enhancement.

The deputy public defender's petition stated that her office did not previously represent appellant, the public defender's office did not have any police reports or a probation report, and "[t]he facts are unknown."[8] This same deputy public defender represented appellant during the entirety of the section 1172.75 proceedings.

On May 3, 2023, the trial court referred the matter to the probation department for preparation of a supplemental report.

**Appellant's Sentencing Statement**

On June 6, 2023, the deputy public defender filed appellant's sentencing statement. The full extent of counsel's argument is as follows:

> "Attached hereto is a letter from [appellant]. [Appellant] suffers from [l]eukemia, [l]iver disease in the end stage and severe arthritis, as well as neuropathy. He has a home to go to if released and has a job waiting. He has been incarcerated for 24 years. We as[k] the court to strike the [three section] 667.5[, subdivision] (b) [enhancements]. In addition, we ask the court to strike [two] of the [section] 667[, subdivision] (a) enhancements as multiple use of enhancements is prohibited."

Counsel's sentencing statement asked the trial court "to consider the additional attached documents, proof of rehabilitation, and suggested sentence."

### *Appellant's Letter*

In support of the sentencing statement, appellant's public defender filed one document: a six-page handwritten letter from appellant that was addressed to the court and dated May 12, 2023.

In his letter, appellant raised two reasons for his sentence to be reduced and for his release on parole. Appellant's first reason was based on his claim that Blodgett's family

---

[8] As previously noted, appellant was represented by retained counsel at his jury trial, and not the public defender's office.

12.

filed a civil lawsuit against the prison: "*My cell mates [sic] family sued the state and won their case holding the state responsible for his death.*  [¶]  *Michael Blodgett estate. Frank & Suzy Moore* [t]heir attorney said they had information *that would release me* if I would come to court for them they would provide me this information.  [¶]  I explained that at the time [I] was in Corcoran SHU and I would be murdered if I went to court for them in addition to this (*my attorney has the case on it*)."  (Italics added.)

Appellant's second reason to reduce his sentence was based on his alleged medical problems.  Appellant stated he was diagnosed with leukemia in 2017, and he sent "a list of my conditions to attorney previously."  Appellant said if he was released on parole, his brother had a job and a home for him, he would work until he died, he was old, and "my health is failing and I'm 57 [years] old."  "Please consider all and please run cases together so I do not have to continue to serve exc[e]ssive years.  24 [years] is enough."  If he was released, it would "relieve the burden on the [s]tate" and he would be successful on parole.

Appellant concluded his request for parole by tying these reasons together:  "They say 15 years is considered a life sentence.  [¶]  These extra years are just too much *if you consider my cellmate[']s [lawsuit].  That alone should allow me to be released* as well as the amount [of] time I've served with leukemia, liver disease.  Also, a very long list of health issues (arthritis) severe.  Neuropathy (severe).  Leukemia bone pain (severe)."  Appellant stated he "*sent a medical document to Public Defender as well as to Michael Blodgett estate [lawsuit] # case.*"  (Italics added.)

The public defender's sentencing statement asked the trial court "to consider the additional attached documents" and "proof of rehabilitation," but appellant's letter was the only supporting document filed.  Counsel did not submit any additional documents or evidence to support appellant's assertions about his medical condition or a lawsuit filed by Blodgett's family.

On or about June 7, 2023, the probation department prepared a supplemental report for appellant's resentencing hearing. The supplemental report was attached to the original probation report, which contained a factual statement about the murder and listed appellant's prior convictions.

**THE SECTION 1172.75 HEARING**

On June 16, 2023, the trial court conducted a hearing on appellant's section 1172.75 petition for recall and resentencing. Appellant appeared via teleconference, and his deputy public defender was in court. The probation report was received.

Appellant's counsel stated she represented appellant in another matter in May 2023, he said that he also had this case, and she determined he had three prior prison term enhancements that should be stricken under section 1172.75.

Appellant's counsel asked the trial court to also dismiss both prior strike convictions, and two of the three section 667, subdivision (a) prior serious felony conviction enhancements, because multiple enhancements were improperly imposed, and instead sentence him to 25 years to life for second degree murder plus five years. Counsel did not address any of the issues raised by appellant in his handwritten letter, about his alleged medical conditions or that the Blodgett family filed a lawsuit that would mitigate his culpability or exonerate him.

The prosecutor agreed appellant's three prior prison term enhancements should be stricken, and objected to dismissal of the other prior convictions. The prosecutor introduced the certified record of appellant's prior convictions, without objection from appellant's counsel. The prosecutor argued: "[Appellant's] criminal history, frankly, I'm not sure if I could even imagine a worse one. We have literally a prior conviction for

14.

murder.[9]  He's serving time on that.  Prior to that, several likely [section] 245s, [section] 12021 possession of a firearm by a felon, and so forth.  [¶]  Given all of that, I … don't believe he deserves any leniency."

**The Trial Court's Resentencing Order**

The trial court stated it had read and reviewed appellant's petition and sentencing statement, and the prosecution did not file a written opposition.  The court stated it could not impose the upper term unless aggravating circumstances were pleaded and proved or admitted by appellant, which did not happen in this case.  The court further stated the certified record of appellant's prior convictions was sufficient evidence to select the appropriate term.

The trial court dismissed the three prior prison term enhancements and recognized it had discretion to dismiss the prior convictions.  The court declined to dismiss the two prior strike convictions "based upon the facts of the case and [appellant's] long criminal history *as outlined in the original probation report* and the certified RAP sheet."  (Italics added.)

> "[Appellant's] three prior strike convictions were from June 27, 1993 for assault with a deadly weapon under … [s]ection 245[, subdivision] (a)(1).  The second was for the same offense from November 2nd, 1993.  And then there was another offense on August 21, 1998 for a [section] 245[, subdivision] (a)(2), assault with a firearm.
>
> "In between then there were two [section] 29800 convictions in 1995 and 1997, formerly … [s]ection 12021[, subdivision] (a)(1), where [appellant] did a prison term for each of those offenses.
>
> "[Appellant] was serving a prison term for that … [s]ection 245[, subdivision] (a)(2) conviction at the time that this offense was committed on April 21st, 2000.

---

**9**      As the court later noted, the prosecutor erroneously stated that appellant had a prior murder conviction.

15.

"[Appellant's] criminal record span[s] from 1989 to 2000 with no significant period of where he was free from incarceration except between August 23rd, 1990 and July 27, 1993 when he had that first [section] 245[, subdivision] (a)(1) conviction."

The trial court also denied appellant's motion to dismiss the prior serious felony conviction enhancements because that would "endanger public safety given [his] prior criminal history, the nature of the current offense, and the conviction that he suffered."

As to second degree murder, the trial court again imposed the third strike term of 45 years to life, plus 15 years for the three prior serious felony conviction enhancements, to be served consecutively to the sentence he was already serving.

### *Appellant's Statement*

After the trial court resentenced him, appellant personally addressed the court about "a negligence case" and said "they have information. *I spoke to my attorney*. That court case stating they wanted me to come to court, they have information that can get me out of prison. *They won that lawsuit—that lawsuit and that case. I told my attorney—I tried to call my attorney and they refused to accept any of my calls*."[10]  (Italics added.)

Appellant also stated that he did not have a prior murder conviction. The trial court agreed that the prosecutor misspoke, the court knew appellant did not have a prior murder conviction, and only his current conviction was for murder. The prosecutor conceded the error. The court adjourned the hearing.[11]

On June 20, 2023, appellant filed a timely notice of appeal.

---

[10]  As will be discussed in sections II and IV, *ante*, appellant's public defender was aware of appellant's claims about the lawsuit since she filed appellant's letter in support of the sentencing statement. When appellant said he tried to call his attorney who did not return his calls, he might have been referring to his retained defense counsel who represented him at his jury trial in 2001.

[11]  The prosecutor's erroneous statement, that appellant had a prior murder conviction, was not prejudicial because the trial court was aware of appellant's record and that only his current conviction was for murder.

On June 23, 2023, an amended abstract of judgment was filed to show that appellant was again sentenced to 45 years to life for count 1, with 15 years for the three prior serious felony conviction enhancements.

## DISCUSSION

### I.  The Trial Court Did Not Abuse Its Discretion at the Section 1172.75 Resentencing Hearing

At appellant's recall and resentencing hearing, the trial court dismissed the three prior prison term enhancements, and denied appellant's motions for dismissal of his two prior strike convictions and two of his three prior serious felony conviction enhancements.  Appellant contends remand for resentencing is required.  We review the applicable provisions.

### A.  Section 1172.75.

Section 1172.75, subdivision (a) states:  "Any sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of [s]ection 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of [s]ection 6600 of the Welfare and Institutions Code is legally invalid."

At the recall and resentencing hearing, section 1172.75 requires the court to "apply the sentencing rules of the Judicial Council and apply any other changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing."  (§ 1172.75, subd. (d)(2).)  "The court may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice."  (§ 1172.75, subd. (d)(3).)

"Resentencing pursuant to this section shall result in a lesser sentence than the one originally imposed as a result of the elimination of the repealed enhancement, unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety.  Resentencing pursuant to this section shall not result in a longer sentence than the one originally imposed."  (§ 1172.75, subd. (d)(1).)

"[S]ection 1172.75, subdivision (d) vests the superior court with broad discretion based on an inherently factual inquiry" in resentencing a defendant, and we review the resentencing order for an abuse of that discretion.  (*People v. Garcia* (2024) 101 Cal.App.5th 848, 856−857.)

**B.  Section 1385**

Appellant also moved for dismissal of his prior serious felony enhancements pursuant to section 1385 because multiple enhancements were imposed.  As amended, section 1385, subdivision (c)(1) states:  "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  (§ 1385, subd. (c)(1).) Subdivision (c)(2) states:  "In exercising its discretion under this subdivision, the court shall consider and afford *great weight* to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others*." (§ 1385, subd. (c)(2), italics added.)

Section 1385, subdivision (c)(2) enumerates nine "mitigating circumstances," including where "[m]ultiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed."  (§ 1385, subd. (c)(2)(B).)  Other mitigating circumstances are when "[t]he application of an

enhancement could result in a sentence of over 20 years," and "[t]he enhancement is based on a prior conviction that is over five years old."  (§ 1385, subd. (c)(2)(C), (H).)

In applying section 1385, subdivision (c), "*absent a finding that dismissal would endanger public safety*, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present.  [Citation.]  In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1029−1030, italics added.)

The trial court's decision not to dismiss an enhancement pursuant to section 1385, subdivision (c), is reviewed for an abuse of discretion.  (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

## C.  Prior Strike Convictions

Appellant additionally moved for dismissal of his prior strike convictions.  When considering whether to dismiss a prior strike conviction, the trial court must consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)  The court's decision whether to dismiss a prior strike conviction is also reviewed for an abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 373.)

## D.  Analysis

At the section 1172.75 hearing, the trial court properly dismissed the three prior prison term enhancements, which reduced the determinate portion of appellant's aggregate sentence from 18 years to 15 years.  The court recognized that it was required to exercise its discretion to conduct "a full resentencing, not merely that the trial court strike the newly 'invalid' enhancements."  (*People v. Monroe* (2022) 85 Cal.App.5th 393, 402; § 1172.75, subd. (c).)

Appellant argued the trial court should grant his motion to dismiss the two prior strike convictions, and two of the three prior serious felony conviction enhancements, because multiple enhancements were imposed.  The court made extensive findings as to why it denied appellant's motion to dismiss the prior strike convictions "based upon the facts of the case and [appellant's] long criminal history.…"  The court did not abuse its discretion under *Williams*, *Carmony*, and section 1385.

The trial court also denied appellant's motion to dismiss any of the prior serious felony conviction enhancements because that would "endanger public safety given [his] prior criminal history, the nature of the current offense, and the conviction that he suffered."  The court's public safety findings again shows that it did not abuse its discretion under *Walker* and section 1385, subdivision (c).

On appeal, appellant asserts the public defender's initial petition for recall and resentencing stated she did not have the police or probation report, and the facts of appellant's conviction were " 'unknown,' " which presumably undermined her arguments to dismiss appellant's prior convictions.  The original probation report, filed at the time of appellant's sentencing hearing in 2001, contained a factual statement about the murder.  At the resentencing hearing, the supplemental probation report was received by the court and the parties.  When the court explained why it would not dismiss the prior convictions, it cited to and relied on both the supplemental and the "original" probation report, which contained the factual statement, and the certified record of appellant's prior convictions.

20.

Appellant's counsel never stated she did not receive the original and supplemental probation reports, that she was still unaware of the facts of appellant's murder conviction, or she was unprepared for the hearing.

Appellant also asserts the public defender's sentencing statement "added attached documents and proof of appellant's rehabilitation for the court's consideration" to support dismissal of his prior convictions and reduction of his sentence. In making this argument, appellant only cites to his handwritten letter filed with the sentencing statement that referred to his medical conditions, the Blodgett family's lawsuit, and that he had been promised a home and a job from his family if he was released.

Appellant did not present the trial court with any independent evidence to corroborate his self-serving statements in the letter that his alleged physical problems were so serious that he should be released, that he had taken steps toward "rehabilitation," about his release plan or, as we will further discuss below, that the Blodgett family filed a lawsuit and obtained mitigating or exonerating evidence. The court did not abuse its discretion in denying appellant's motions to dismiss his prior strike convictions and prior serious felony enhancements.

## II. Appellant's *Brady* Contentions Are Refuted by the Record of the Section 1172.75 Proceedings

On appeal, appellant argues for the first time that the People violated its constitutional duty under *Brady* at the section 1172.75 hearing, by failing to produce exculpatory evidence arising from the Blodgett family's lawsuit. Appellant's argument is solely based on his handwritten letter and his statements at the resentencing hearing about the alleged outcome of that lawsuit. Based on his letter and statements, appellant asserts *Brady* applies to medical records, the prosecution had a constitutional obligation to disclose material exculpatory evidence resulting from the Blodgett family's lawsuit, and "grossly improper" medical treatment of Blodgett may have "*discharge[d] [appellant's]*

21.

*liability for homicide* if the maltreatment [was] the sole cause of death and hence an unforeseeable intervening cause."  (Italics added.)

Appellant argues "the [s]tate's established negligence in the cellmate's death which held the [s]tate responsible for the death in the estate's lawsuit mitigated his excessive punishment that already exceeded 24 years of imprisonment."  While appellant declares the instant appeal is "not a direct (or collateral) attack on the entire judgment," he asserts "[t]he [*Brady*] evidence played 'a mitigating, though not exculpatory, role' in the crime he committed.  [Citation.]  The evidence could reasonably be taken to put the sentence in such a different light *to undermine confidence in the resentencing's 60 years-to-life outcome*.  [Citation.]  The sentence should be reversed and the matter should be remanded for further proceedings consistent with California and Fourteenth Amendment Due Process."  (Italics added.)

We will find that appellant's *Brady* claims are undermined by the record of the section 1172.75 proceedings.

## A.  *Brady*

We begin with *Brady*'s well-settled principles.  "In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation].  Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." '  [Citation.]  In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

government's behalf in the case, including the police.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043; *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709–710 (*Johnson*).)

"A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work. The important determinant is whether the person or agency has been 'acting on the government's behalf' [citation] or 'assisting the government's case.' " (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1315.) However, "information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." (*Ibid*.)

In addition, " '[t]he prosecution has no general duty to seek out, obtain, and disclose all evidence that might be beneficial to the defense.' [Citations.] *Brady* did not create a general constitutional right to discovery in a criminal case." (*People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1472.) "Moreover, '*Brady* … does not require the disclosure of information that is of mere speculative value' …." (*People v. Williams* (2013) 58 Cal.4th 197, 259.)

Prejudice, in the context of a *Brady* claim, "focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed

the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)

"Failure to object is not relevant to a *Brady* analysis. The *Brady* obligation is self executing. There need be no motion, request, or objection to trigger disclosure. The prosecution has a sua sponte duty to provide *Brady* information." (*People v. Harrison* (2017) 16 Cal.App.5th 704, 710 (*Harrison*).)

"In reviewing a claim that the prosecutor violated due process under *Brady*, we apply independent review to conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim." (*People v. Stewart* (2020) 55 Cal.App.5th 755, 770.)

*Brady* may be applicable in postjudgment evidentiary and resentencing hearings. (See, e.g., *People v. Nuno* (2024) 105 Cal.App.5th 1030, 1061–1062 [*Brady* applicable in section 1172.6 resentencing proceeding].)

**B. Appellant and His Public Defender Were Aware of the Alleged Lawsuit**

We address appellant's *Brady* contentions assuming, without deciding, he may raise this issue on appeal from a section 1172.75 recall and resentencing hearing, and whether he has satisfied the other requirements for *Brady* to apply in this case.

While the *Brady* obligation is "self-executing" and cannot be waived by failing to object (*Harrison*, *supra*, 16 Cal.App.5th at p. 710), appellant's claims about the People's purported *Brady* violation are undermined by the record.

"The second element of a *Brady* claim is that the evidence must have been 'suppressed' by the government. [Citations.] Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. [Citation.] *If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence*, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence.

[Citations.]  Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it ' "by the exercise of reasonable diligence." ' " (*Salazar*, *supra*, 35 Cal.4th at pp. 1048−1049, italics added.)

"[I]f the prosecution provides the defense with, *or if the defense otherwise has, sufficient information to obtain the evidence itself*, there is no *Brady* violation."  *Johnson*, *supra*, 61 Cal.4th at p. 716, italics added.)  "When … a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."  (*U.S. v. Aichele* (9th Cir. 1991) 941 F.2d 761, 764.)  "[D]efense counsel cannot ignore that which is given to him or of which he otherwise is aware…." (*Amado v. Gonzalez* (9th Cir. 2014) 758 F.3d 1119, 1137.)

Appellant's claims are based on his account of the lawsuit filed by Blodgett's family against the prison and the state, as stated in his handwritten letter to the court, that "[m]y cell mates [*sic*] family sued the state and won their case holding the state responsible for his death," the names of Blodgett's family members who filed the lawsuit, their attorney allegedly had information that would "release" him but only if he went to court for them, his lengthy sentence was "too much if you consider my cell mates [*sic*] lawsuit" that "alone should allow me to be released," he sent information to his lawyer about the Blodgett estate's lawsuit and the case number, and his claims could be verified "via documents attorney has."  At the resentencing hearing, appellant personally addressed the court and stated there was a negligence case, "they" had information that could "get me out of prison."  "They won [the] lawsuit," and added the contradictory statements that he told his attorney about it but also that he tried to call his attorney "and they refused to accept any of my calls."

The record of the section 1172.75 proceedings show that appellant's own statements undermine the second requirement to establish a *Brady* violation, that the People must have suppressed the evidence.  Instead, the record demonstrates that appellant, his public defender, and possibly another attorney were aware of a possible

civil lawsuit, presumably filed or about to be filed in state or federal court, based on Blodgett's death at Tehachapi. Appellant obviously submitted his letter to the public defender, who attached it in support of his sentencing statement. There is nothing in the letter to show that appellant and his attorney(s) could not have discovered more information about a civil lawsuit by the exercise of reasonable diligence, or to suggest the People suppressed evidence about the matter that would have prevented appellant and his attorneys from obtaining the information.

The record of the section 1172.75 hearing thus shows that appellant's *Brady* arguments are meritless and remand is not required.

## III. Judicial Notice and Appellant's Objections

As set forth above, this court filed an order pursuant to Government Code section 68081, advising the parties that we were considering taking judicial notice of our own records from appellant's direct appeal, and allowing for the parties to file objections. The People did not object. Appellant objected to judicial notice of the record from the direct appeal, but also stated judicial notice would be appropriate in certain circumstances.

## A. Appellant's Objections to Judicial Notice

In his letter brief objecting to judicial notice, appellant claimed this court violated Government Code section 68081, even though we filed the briefing order, because we "failed to notice *why* the records are relevant to the appeal and [that] denies appellant the opportunity to present *relevant* information to the propriety of taking judicial notice."

While appellant raises this objection, he also acknowledges that an appellate court may take judicial notice of its own records. We agree and overrule his objection on this point. Appellate courts routinely take judicial notice of the records of their own cases under Evidence Code section 452, subdivision (d) and section 459, subdivision (a). (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 ["On our own motion, we take judicial notice of [two prior opinions in same case] as well as the

26.

underlying appellate records.  (See Evid. Code, § 452, subd. (d).)"]; *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 426, fn. 1 ["We take judicial notice of the record on appeal filed in this court in [prior appeal in same case], as well as of this court's unpublished opinion in that matter.  (Evid. Code, §§ 451, subd. (a), 452, subd. (d), 459, subd. (a).)"].)

Appellant's objections based on the briefing order are meritless.  In interpreting Government Code section 68081, the California Supreme Court has explained:  "We do not suggest … that the parties have a right under [Government Code] section 68081 to submit supplemental briefs or be granted a rehearing each time an appellate court relies upon authority or employs a mode of analysis that was not briefed by the parties.  The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of [Government Code] section 68081."  (*People v. Alice* (2007) 41 Cal.4th 668, 679.)

## B.  Judicial Notice to Facilitate Remand for Resentencing

In his letter brief, appellant states that he will not object to judicial notice of the trial transcripts from his direct appeal if they "are not of substantial consequence to the appeal's determination," but rather are made part of the current record to support appellant's requested remand for a new resentencing hearing since the "Public Defender did not represent [appellant] on the underlying case, had no police or <u>probation reports, and the facts were 'unknown</u>.' "

While we have overruled appellant's objections to judicial notice, we have not relied on the trial records to find the court did not abuse its discretion when it denied appellant's motions to further reduce his sentence.  As explained in section I, *ante*, the court's resentencing findings are supported by the record from the section 1172.75 hearing.  The trial court and the parties received both the original and supplemental

27.

probation reports that included a factual summary of the murder, and the prosecution introduced appellant's certified record of conviction without objection. Appellant's counsel never claimed she was still unaware of the facts when the prosecutor opposed her motions to further reduce appellant's sentence, or when the court made findings that dismissing the prior convictions would endanger public safety.

## C. Judicial Notice to Refute the People's Opposition to Appellant's *Brady* Claims

Appellant raised his *Brady* claims in his opening brief. In respondent's brief, the People argued that even assuming Blodgett's family filed a lawsuit, appellant failed to show prejudice because he did not produce "any evidence of the lawsuit and/or the findings made" about the state's alleged negligence in Blodgett's death that would exculpate or mitigate his criminal culpability.

In his letter brief in response to our judicial notice order, appellant cites to the People's argument that there was no evidence about a lawsuit, and states that he has no objection to this court taking judicial notice of the trial records "if the prior records are viewed as circumstantial evidence *to refute respondent's assumption of a lawsuit* … because the prosecution witnesses discussed the civil lawsuit, including with the trial prosecutor …, and the witnesses testified about the lawsuit. The remand order should recite these facts in the <u>interest of justice</u>." (Italics added.) (Underline in original.) Appellant cites to specific pages in the trial transcript with references to the lawsuit.

Appellant states he has no objection to this court taking judicial notice of the trial record because "[t]he prosecution witnesses' discussions and testimony about the lawsuit constituted circumstantial evidence that refutes respondent's assumption [in respondent's brief] about a lawsuit…. *Stated differently, there was a lawsuit which prosecution witnesses, superiors, the prison litigation coordinator, and trial prosecutor discussed* [at trial]. The prosecution simply needs to access its own records in order to comply fully with its constitutional duty. The remand order should recite these facts in the interest of justice." (Italics added.)

Appellant thus withdraws his objection to judicial notice so this court may review the trial transcripts that purportedly support his *Brady* claim. We turn to the trial transcripts to determine if that record supports his *Brady* arguments.

## IV. References to the Potential Lawsuit at Appellant's Jury Trial

Appellant's jury trial was held in September 2001, and there are several references in the transcript to the issue that Blodgett's family either filed or they were going to file a civil lawsuit against the prison and the State of California because of Blodgett's death.

During pretrial motions, appellant's retained defense counsel moved to exclude evidence about appellant's disciplinary violations that were reported after the homicide. Counsel argued the incidents were not relevant because the correctional officers only started to file disciplinary reports against appellant "after [the CDCR] becomes aware of the fact that they are going to be sued by Blodgett's family," and "some of these officers are involved in that civil [law]suit."

There were also references to the possible lawsuit in the jury's presence, which the trial court allowed as relevant to the bias of the correctional officers' trial testimony. During cross-examination of Copeland, defense counsel asked: "[It's m]y understanding that the department—that the family of Mr. Blodgett is suing [California Correctional Institution (CCI)]; is that correct?" The court overruled the prosecution's objection, and Copeland testified he had not received any paperwork about a lawsuit.

During cross-examination of LaPorta, defense counsel asked: "It's also my understanding that the [CDCR] is being sued by the family, is that correct, the family of Mr. Blodgett?" The prosecutor objected and the court allowed another question. Counsel asked LaPorta whether he had meetings with his superiors or talked with other officers about the incident. LaPorta testified: "It has come up that we [have] been subpoenaed to court three or four times, and they've all been postponed and, yes, that there is a lawsuit, that we received a package from the litigation coordinator at CCI." Upon further questioning, LaPorta testified he was referring to subpoenas that were postponed in the

criminal homicide case, and there was nothing about a civil case that affected his testimony.

Also in response to questioning, LaPorta testified there was "information in the civil matter that I had read that I had not been aware of for this case," that "was obtained through letters. I imagine [the Investigative Services Unit (ISU)] had obtained information through letters that they found, discovered, that we had no knowledge of prior to this." LaPorta further testified the letters were written by inmates and not the prison staff, and this information did not affect his trial testimony. He did not reveal the nature of this information.

In addition, appellant's defense counsel cross-examined Dr. Brown, the pathologist, about whether appellant was the cause of Blodgett's death. Counsel asked about the obstruction of Blodgett's airway and whether a tube was inserted down his throat. Dr. Brown testified an oral endotracheal tube was used to facilitate an airway into his lungs. The prosecutor objected to further questions on this subject. Defense counsel said the subject was relevant because Dr. Brown testified Blodgett "was not able to get air in his lung … possibly caused by strangulation," but there "can be other causes" for Blodgett's death.

The trial court replied: "If you're talking about the medical treatment, the state of the law is … that if the original injury is the cause of death, medical treatment thereafter, even if it contributed to the cause of death, is not a defense to the person who caused the original injury. [¶] That is the state of the law. So it's irrelevant from that sense as to what was done by the medical people afterwards, if you're saying that contributed to the cause of death."

During his trial testimony, appellant denied he killed Blodgett and testified that "[Blodgett] died because they put a mask on his face, and he was vomiting and choked on corn." "I know how [Blodgett], and CDC[R] knows how [Blodgett], died, but what you're trying to get to me to say, yeah, I killed [Blodgett]. That's not true. [¶] I never

killed [Blodgett]. [Blodgett] left my cell alive, and he stayed alive for 33 minutes after leaving my cell."[12]

### *Analysis*

As explained *ante*, the *Brady* obligation is "self-executing" and not waived by failing to object. (*Harrison*, *supra*, 16 Cal.App.5th 704, 710.) We have also explained that the second element of a *Brady* claim, that the People suppressed material evidence, is not shown if the evidence is in the defendant's possession or available to the defendant through the exercise of due diligence. (*Salazar*, *supra*, 35 Cal.4th at pp. 1048–1049.) "[I]f the prosecution provides the defense with, or if the defense otherwise has, sufficient information to obtain the evidence itself, there is no *Brady* violation." *Johnson*, *supra*, 61 Cal.4th at p. 716.)

Our review of the trial record shows that it undermines appellant's *Brady* arguments. As of September 2001, when appellant's murder trial was held, appellant and his retained defense attorney knew the Blodgett family had either filed or they were going to file a civil lawsuit against the prison and the State of California because of Blodgett's death. Indeed, trial counsel possessed sufficient information to cross-examine the prosecution's witnesses about whether their testimony was influenced by their knowledge of the civil lawsuit over Blodgett's death. Counsel also cross-examined the pathologist about Blodgett's medical treatment, apparently to question whether his death could have resulted from something other than the beating inflicted by appellant.

Appellant's trial attorney was well aware of this potential lawsuit, and never advised the court that she was unable to obtain additional information about the nature or status of the civil litigation, that the prosecution failed to produce further evidence about it, or there had been some type of confidential settlement. Counsel did not raise

---

[12] As will be discussed in section V, *ante*, the trial court instructed the jury with CALJIC No. 8.57, about medical negligence and causation, likely because of the references to the possible lawsuit in the jury's presence.

discovery or *Brady* objections during trial, and appointed appellate counsel did not raise such issues in appellant's direct appeal from the murder conviction in 2002 through 2003.[13]

"When … a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." (*U.S. v. Aichele*, *supra*, 941 F.2d at p. 764.) "[D]efense counsel cannot ignore that which is given to him or of which he otherwise is aware…." (*Amado v. Gonzalez*, *supra*, 758 F.3d at p. 1137.) There is no evidence in either the trial record or the section 1172.75 proceedings that appellant and his attorneys were unable to discover, by the exercise of reasonable diligence, further information about whether or not the lawsuit was filed, it was procedurally dismissed or proceeded to judgment, the actual outcome, and the outcome was relevant to appellant's murder conviction.

## V. Appellant's Causation Arguments

In his opening appellate brief, appellant argues remand for resentencing is required because the Blodgett family's lawsuit resulted in disclosure of evidence that would exonerate him or mitigate his culpability for the homicide under a causation analysis.

Appellant's arguments address causation, and he states that "if a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the decedent's death," but argues that "when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause," citing to *People v. Roberts* (1992) 2 Cal.4th 271 and other cases. Appellant asserts "the [s]tate's established negligence in [Blodgett's] death which held the [s]tate responsible for the death in the

---

[13] In the direct appeal from the murder conviction, appellate counsel's briefs were filed in 2002, and this court's opinion was filed in 2003. In this appeal, appellant is represented by the same appointed appellate counsel who represented him in the direct appeal from his murder conviction in 2002 through 2003.

estate's lawsuit mitigated his excessive punishment" in this case, and the People suppressed favorable *Brady* evidence on these facts. Appellant again cites to his handwritten letter and statements at the resentencing hearing as the only evidentiary support for his suppositions about the lawsuit and the alleged favorable outcome.

In response, the People argue that even if there was a lawsuit and the state was found to bear some legal culpability for Blodgett's death, that would not exculpate appellant or mitigate his criminal culpability for murder because "[p]resumably, the jury in appellant's murder trial was properly instructed on causation and properly found that the injuries inflicted by appellant caused his cellmate's death," also citing to *Roberts* about medical malpractice and causation.

In his reply brief, appellant argues *Roberts* is no longer controlling because the defendant in *Roberts* later had his murder conviction reversed in *Roberts v. Broomfield* 637 F.Supp.3d 872 (*Broomfield*). Appellant cites to *Broomfield* in support of his *Brady* contentions, and argues the record herein also establishes that remand is required for a similar *Brady* violation.

## A.  CALJIC No. 8.57

Even assuming appellant's causation arguments are cognizable in this appeal, our review of the trial record refutes his contentions. As set forth in section IV, *ante*, the Blodgett family's intent to file a lawsuit was repeatedly addressed in the jury's presence, over the People's objections. As the likely result of these references, the trial court granted the prosecution's motion to instruct the jury with CALJIC No. 8.57 on medical negligence and causation. The instruction stated: "Where the original injury is a cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that the treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility. [¶] Where, however, the original injury is not a cause of the death and the death was caused by

medical or surgical treatment or some other cause, then the defendant is not guilty of an unlawful homicide."

In his direct appeal from the murder conviction, appellant did not challenge CALJIC No. 8.57, and the language remains a correct statement of the law. As *Roberts* explained: "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations.] To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause." (*People v. Roberts*, *supra*, 2 Cal.4th at p. 312.) *Roberts* applied the law to the facts in that particular case, and held the trial court properly refused to give CALJIC No. 8.57 because "the record is devoid of any evidence of grossly improper treatment." (*Roberts*, at p. 312.)

The causation language in CALJIC No. 8.57, as given at appellant's murder trial, is now stated in CALCRIM No. 620, and has been reaffirmed by the California Supreme Court in decisions reached after *Roberts*. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 643−644; *People v. Catlin* (2001) 26 Cal.4th 81, 155; *People v. Sanchez* (2001) 26 Cal.4th 834, 847–848.)

## B. *Brady* and *Broomfield*

As noted in appellant's reply brief, *Broomfield* reversed the murder conviction of the same defendant who was the subject of *Roberts*, based on evidence of prosecutorial misconduct, *Brady* violations, and prejudice. Appellant asserts *Broomfield* supports his *Brady* arguments for remand in this case.

However, *Broomfield* did not reverse that defendant's murder conviction based on his self-serving and unsupported allegations of *Brady* error where evidence could have been discovered through the exercise of reasonable diligence. Instead, *Broomfield* reversed the defendant's conviction based on a vastly different evidentiary record that was fully developed after the Supreme Court's decision in *Roberts*. After that ruling, the

defendant filed a petition for writ of habeas corpus in state court, an evidentiary hearing was held, but relief was denied. The defendant then filed a writ petition in federal court, another evidentiary hearing was held, and additional evidence was disclosed that revealed *Brady* violations and prosecutorial misconduct occurred at trial. *Broomfield* held these violations were prejudicial because the prosecution suppressed material impeachment evidence, and reversed the defendant's murder conviction. (*Broomfield*, *supra*, 637 F.Supp.3d at pp. 872, 904, 1029.)[14]

In contrast to *Broomfield*, the record herein fails to establish a *Brady* violation. As we have discussed, even assuming appellant's *Brady* claims are cognizable in this appeal, appellant has not shown good cause to remand for further proceedings. Instead, the entirety of the record shows that appellant and his retained counsel were aware of the possible civil lawsuit at the time of his murder trial in 2001, his appellate counsel knew about it during the direct appeal in 2002 through 2003 given the references in the trial transcript, and his public defender also knew about it at the section 1172.75 hearing. The purported evidence was "available to [appellant] through the exercise of due diligence" (*Salazar*, *supra*, 35 Cal.4th at pp. 1048−1049) and his *Brady* and causation claims are meritless based on the record currently before this court.

## DISPOSITION

The trial court's judgment of resentencing on June 16, 2023, is affirmed.

---

[14] While *Broomfield* reversed the defendant's conviction for prosecutorial misconduct and *Brady* error, it agreed with *Roberts* that the failure to instruct the jury with CALJIC No. 8.57 on causation did not violate due process. (*Broomfield*, *supra*, 637 F.Supp.3d at p. 1029.)